**WATTS et al. v. MANN et al.**

**No. 9492.**

Court of Civil Appeals of Texas. Austin.

April 18, 1945.

Rehearing Denied May 9, 1945.

Donald S. Thomas, Edward Clark, and Everett L. Looney, all of Austin, for appellants.

Grover Sellers, Atty. Gen., and R. Dean Moorhead, Ocie Speer, and Frederick B. Isely, Asst. Attys. Gen., for appellees.

McCLENDON, Chief Justice.

Appeal by Walter Watts and 29 others (plaintiffs below) from a judgment: (1) declaring "valid and constitutional" Chapter 144, Acts 48th Legislature, 1943, Regular Session, Vernon's Ann.Civ.St. art. 4646b (popularly known as the Loan Shark Act); and (2) denying the equitable relief (injunction against enforcing the Act) sought by plaintiffs against defendants (the State of Texas, the Attorney General, and various district and county attorneys); and (3) perpetually enjoining and restraining each of the plaintiffs and their respective officers, agents, servants and employees "from demanding or receiving interest at a rate in excess of ten per centum (10%) per annum on or in connection with any loan made by" plaintiffs, "or any of them, or by their respective officers, agents, servants or employees within the State of Texas, or from using any means to attempt to collect usurious interest from the borrowers of such loans, and from hereafter charging any borrower usurious interest, or contracting for any usurious interest, on any loans made by such persons within this State."

The suit was originally brought by Watts, the other plaintiffs intervening and adopting his allegations, against the Attorney General and district and county attorneys seeking (1) a judgment under the Uniform Declaratory Judgment Act, Chap. 164, p. 265, Gen. Laws Reg. Ses. 48th Leg.—1943, Vernon's Ann.Civ.St. art. 2524—1, declaring the Loan Act invalid upon grounds stated below; and (2) injunction against its enforcement. The Attorney General filed answers on behalf of himself (in his official capacity) and the State, and on behalf of the State filed a petition in cross-action, in which he alleged violation of the Act by each plaintiff, and sought the injunctive relief afforded by the Act against each of them. Plaintiffs filed an answer to this cross-action in which Watts admitted and the other plaintiffs denied violation of the Act. The case was tried to a jury upon special issues (except as to Watts against whom a verdict was directed), and upon their answers (and Watts' admission) judgment was rendered as above stated. Plaintiffs have appealed, urging invalidity of the Act and various trial errors noted below.

The body of the Act (omitting Secs. 4 and 5, severability as to invalidity and emergency clauses) reads:

"Section 1. The State of Texas through its Attorney General, or any District or County Attorney, may institute a suit in the District Court to enjoin any person, firm, or corporation or any officer, agent, servant or employee of such person, firm, or corporation who is engaged in the business of habitually loaning money for the use and detention of which usurious interest has been charged against or contracted to be paid by the borrower, from demanding, receiving or by the use of any means attempting to collect from the borrower usurious interest on account of any loan, or from thereafter charging any borrower usurious interest, or contracting for any usurious interest. All persons, firms, or corporations, and their agents, officers, servants and employees similarly engaged in making loans of money as herein defined, who reside in the same county, may be joined in a single suit and no plea of misjoinder of parties defendant shall ever be available to any defendant in such suit.

"Sec. 2. By the term 'habitually' as used in this Act, is meant the making of as many as three (3) loans on which or in connection with which usurious interest is charged or contracted for within a period of six (6) months next preceding the filing of any such suit.

"By the term 'usurious interest' as used in this Act, is meant interest at a rate in

excess of ten (10%) per centum per annum.

"Sec. 2a. Nothing in this Act shall in any way modify, alter or change any valid provision of Article 8 of Chapter 5 of House Bill No. 79, Acts of the Regular Session, 48th Legislature, nor shall anything in this Act prevent charging of any actual and necessary expense, now or hereafter permitted and authorized by law, and such shall not be considered interest.

"In the trial of any application for injunction under this Act there shall exist a prima facie presumption that the actual and necessary expenses of making any such loan was One ($1.00) Dollar for each Fifty ($50.00) Dollars, or fractional part thereof loaned; but this prima facie presumption shall extend only to the first note or debt owing at the same time by an individual to any person, firm, corporation, partnership or association, and shall not apply to any renewal or extension thereof unless the original note or debt and all extensions thereof were for a period of not less than sixty (60) days.

"Sec. 3. In any such suit venue shall lie in the county of the residence of a defendant, or in a county where such business of loaning money is being conducted by such defendant."

The Act is attacked as invalid upon the following (substantially stated) grounds:

1. Under Texas Constitution Art. 16, Sec. 11, Vernon's Ann.St., the Legislature is authorized:

(a) To prevent usury *only* by providing "pains and penalties," which does not embrace injunction. And

(b) To provide "pains and penalties" to prevent *all* contracts for usury; not merely those named in the Act.

2. The Act denies plaintiffs "equal rights" and grants "privileges" to others in violation of Art. 1, Sec. 3, Texas Constitution, and deprives plaintiffs of property and privileges without due process of law, in violation of Art. 1, Sec. 19, Texas Constitution and of the 14th Amendment to the Federal Constitution, in that it authorizes an injunction:

(a) Against a money lender and not against any other class of usurers.

(b) Against one who makes as many as three usurious loans, and not against one making a less number.

3. It is violative of Art. 5, Sec. 8, Texas Constitution, in that it confers jurisdiction on the district court to grant injunctions at the instance of the State to protect purely private rights.

4. It is in conflict with the Federal Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq.

5. It is in conflict with the Sherman (Federal) Anti-Trust Act, 15 U.S.C.A. § 1–7, 15 note.

In addition to briefs of the parties we have been furnished copies of a very able treatise entitled "Usury Control by Injunction," compiled by the Junior Bar Section of our State Bar, which contains a collation and analysis of cases upon points involving validity of the Loan Act. This treatise has been very helpful, as well as have been the briefs.

Considering the first ground of invalidity: the applicable portion of Const., Art. 16, Sec. 11, with supplied emphasis upon the pertinent wording, reads: "*All* contracts for a greater rate of interest than ten per centum per annum, shall be deemed usurious, and the *first Legislature after this amendment is adopted, shall provide appropriate pains and penalties to prevent the same.*"

The particular ground urged assumes that the direction or mandate to the legislature to provide suitable "pains and penalties" to prevent "the same" (that is *all* usurious contracts) is a grant of power and as such constitutes in effect a limitation upon the powers of the legislature as to: (a) preventives (pains and penalties only) and (b) the application thereof (to *all*—not merely some—usurious contracts). At the time this amendment was adopted (1891), as well as at the time the section was originally adopted (1876), the words "pains and penalties" (so the argument runs) had a fixed and definite meaning which did not include injunction. Further, it seems to be appellees' contention that by "*appropriate* pains and penalties," was meant (applying the doctrine of ejusdem generis) those of the same general character as had up to that time been employed against violation of usury laws. In this connection appellants' brief contains an historical résumé of the usury laws in England, the American Colonies, and the Republic and State of Texas up to the time of the adoption of the amendment; giving the various penalties that such laws had from time to time inflicted upon usurers. As a study of a very important subject the brief upon this point shows a

rather extended investigation and is both interesting and enlightening. But we do not regard the matter as having material bearing upon the case at bar, and for that reason a simple statement of appellants' contention thereon is all that is necessary here. We may concede for our present purposes that "pains and penalties" does not embrace "injunction" within the meaning of the amendment or otherwise.

If we were dealing with a constitutional grant of power the argument might be apropos. But such clearly is not the case. From the inception of our American form of constitutional government it has been persistently held (as aptly expressed in a recent standard text) that: "A doctrine firmly settled in the law is that a state constitution is in no manner a grant of power. It operates solely as a limitation of power. All power which is not limited by the Constitution inheres in the people, and an act of a state legislature is legal when the Constitution contains no prohibition against it." 11 Am.Jur., p. 619, § 18.

This doctrine is fundamental and may now be regarded as axiomatic. It has been stated and restated many times by courts of last resort of this State. Citation and discussion of the decisions would be supererogatory. The decisions cited on this point by appellants deal with grants of, limitations upon, or inhibitions against the exercise of power. They are therefore not in point here, and need not be discussed.

The portion of the section we are now considering reads: "the first Legislature after this amendment is adopted, shall provide appropriate pains and penalties to prevent the same." This is in no sense the language of a grant of power; nor by implication or otherwise a limitation upon or inhibition against use of power. It was, what its language implies, and implies only, a mandate or direction to the legislature to do without delay (the first legislature thereafter) what the legislature had the inherent power to do independently of the mandate or direction. If it could be construed as a grant of power, then clearly the grant would be limited by its express terms to the first Legislature after adoption of the amendment. Such construction would be inevitable and would "freeze" the legislation passed by the expressly designated first Legislature for all future time, absent further constitutional change. That such is not the meaning of the language employed was expressly held in the adopted Commission opinion (Judge Critz writing) in Palmetto Lumber Co. v. Gibbs, 124 Tex. 615, 80 S.W.2d 742, 744, 102 A.L.R. 474. We quote: "Of course, the use of the words 'first Legislature' was not intended to limit legislation on the subject of usury to that Legislature alone, but merely to indicate the constitutional intent that such legislation should not be delayed."

A case directly in point upholding the power of the legislature as against the attack under consideration to enact the Loan Act is San Antonio & AP R. v. State, 79 Tex. 264, 14 S.W. 1063, 1064 (Chief Justice Stayton writing). That was a suit by the State against the railway for penalties for failure to erect a depot at the point of intersection with another railroad in violation of a statute. One attack upon the statute was that it violated Sec. 2 of Art. 10 of our Constitution providing that: "The legislature shall pass laws to correct abuses, and prevent unjust discrimination and extortion in * * * freight and passenger tariffs * * * pass laws establishing reasonable maximum rates * * * for * * * passengers and freight * * * *and enforce all such laws by adequate penalties.*" (Emphasis supplied.)

Upon this point the opinion reads:

"It seems to be contended that this section operates as a limitation on the power of the legislature, which took from it the power to enact the law in question. There is nothing in the language of this section indicating an intention to limit the power of the legislature, but, on the contrary, the intention seems to have been to make it incumbent on that department of the government to pass such laws as might be necessary to carry out the purposes suggested in it.

"A command in the constitution to the legislature to pass laws on a given subject cannot be understood to operate as a prohibition to enact laws upon another, and, in the absence of some prohibition in the constitution of the state or of the United States, it is understood that a state legislature has power to pass all such laws as may be deemed necessary for public welfare, or the protection of private right."

The application of this holding to the instant issue is obvious and requires no elucidation. Sec. 11 of Art. 16 imposes no inhibition against the enactment of the Loan Act. If it is invalid, it must be held so upon some other ground.

The further point is urged that the laws enacted by the first Legislature after adoption of the Constitution of 1875 and the 1891 amendment, respectively, constituted a legislative interpretation of the amendment. That is quite true to the extent, and the extent only, that these laws imported a legislative declaration that they were within the general powers of the Legislature to enact, and that they constituted the legislative view of performance at that time of the duty imposed by the constitutional mandate. Their enactment did not import that the ultimate boundaries of legislative power, either generally upon the subject of usury prevention or specifically as compliance with the constitutional mandate, were therein delineated. Legislative interpretation as applied to the constitution may be resorted to for the purpose of holding an "act constitutional, unless it be clearly not." Dowdell v. McBride, 92 Tex. 239, 47 S.W. 524, 525. But to hold that enactments of a particular class upon a given subject by one or more Legislatures may operate upon succeeding Legislatures as a limitation to that particular class of enactments upon the given subject would extend the doctrine of legislative interpretation to fields foreign to those in which it has been or appropriately may be applied. Implicit in the creation of the Legislature by the Constitution of the State is the delegation of the lawmaking power of the people to that department of government, circumscribed only by the limitations (express or implied) contained in that instrument or in the Federal Constitution. In so far as these limitations are not exceeded legislative enactments are the enactments of the people themselves acting through their representatives. To hold that those representatives at a given time could bind their successors by diminishing or enlarging their delegated powers and duties would sap the very foundations of the essentially supporting pillars of constitutional government through representatives elected from time to time by the people.

The second ground of invalidity does deal with constitutional limitations, or inhibitions: (a) depriving one of "equal rights" guaranteed by Art. 1, Sec. 3, and granting to others "exclusive * * * privileges," denied by that section; and (2) depriving one of property and privileges in violation of the due process clauses of the State and Federal Constitutions. Specifically the contention is that in limiting the provisions of the Act to money lenders and not extending it to other classes of usurers, and in further limiting it to the lenders making three or more usurious loans in a given period and in not extending it to money lenders making only one or two such loans, the stated constitutional provisions were transgressed in that the Act constitutes an unwarranted discrimination against appellants. The Act, it is urged, does not operate equally and fairly against all usurers or all money lender usurers. It is therefore discriminatory and constitutes class legislation without substantial or reasonable basis for the classifications it makes. The principles here involved are of long standing and general acceptation. Substantially they are: The Legislature may classify law violators and impose different penalties, inhibitions and restrictions upon the several classes, provided there is a reasonable basis for the classification. In determining whether there is a reasonable basis for the classification there is a general presumption that the Legislature has done its duty, not violated the Constitution; and therefore the classification will be upheld unless it appears, clearly and without doubt, that it has no reasonable basis of support. "In all instances where the court exercises its power to invalidate, the conflict of the statute with the Constitution must be irreconcilable, because it is only a decent respect to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity until the contrary is shown beyond a reasonable doubt. Therefore, in no doubtful case will the judiciary pronounce a legislative act to be contrary to the Constitution; to doubt the constitutionality of a law is to resolve the doubt in favor of its validity." 11 Am.Jur., pp. 719, 720, § 92. The great John Marshall, seven years after his opinion in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (the first holding that the Supreme Court of the United States could declare an Act of Congress invalid) wrote in Fletcher v. Peck, 6 Cranch 87, 128, 3 L.Ed. 162: "The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight

implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

And this is the only tenable rule compatible with our system of division of governmental powers between the three departments, each of which is equally charged with oath bound obedience to and support of the Constitution. The enactment of laws is the joint product of two of those departments, except in the rare instances in which an executive veto is overriden. While the general rule is well established, its application to the wide variety of situations that have been presented to the courts for adjudication, has resulted in many irreconcilable conflicts in decision. Especially is this true in determining the question whether there is reasonable basis for particular classification made in a legislative act. It would not be helpful in resolving our present inquiry to attempt an analysis of specific cases holding this or that particular classification valid or invalid under application of the test of reasonableness.

We have here a comparatively simple situation. Usury is defined and denounced by the Constitution. Independently, therefore, of the express mandate of the Constitution, the legislature under its general lawmaking powers, is authorized to adopt such measures as it may deem appropriate to prevent, suppress or minimize it; its discretion in that regard being circumscribed only by such inhibitions as are imposed by the Constitution. The effect of the constitutional provision (self-executing in that regard) was to make "usury a quasi offense." Hemphill v. Watson, 60 Tex. 679. Usurers therefore are law violators, guilty of committing a "quasi offense." The application of the law to "habitual" or chronic violators and not to mere casual violators, rests upon a well-recognized legitimate basis of classification of long standing. In the realm of criminal law second and third offenders are often meted out severer punishments than first offenders. We see no reason why a similar rule may not with propriety be applied in the realm of quasi offenses. Especially so, when dealing with purely preventive measures, as is the case here. Even in purely civil matters, such as taxation, classification of subjects based upon amount or value, in which the lowest bracket is entirely exempt, and the others graduated, is well-recognized as valid; a notable example being income and inheritance taxes. For discussion of this subject see Community Public Service Co. v. James, Tex.Civ.App., 167 S.W.2d 588 (error ref. W.M.). The real objective of the Act was to break up the practice or business of the habitual usurer—a business recognized by the Act as inimical to the public welfare. The designation of a minimum of three offenses in any six month period was merely to have a definite criterion by which to distinguish the habitual from the mere casual usurer. This was a matter clearly within the legislative prerogative to determine; and is not a subject of judicial review.

The application of the Act to money lenders and not to other classes of usurers is predicated upon an express legislative finding of fact in the emergency clause which reads: "The fact that the Supreme Court has recently held (Ex Parte Hughes, 133 Tex. 505, 129 S.W.2d 270) that there is no provision of law authorizing the State of Texas to institute and maintain such a suit as herein authorized by the State of Texas, and the fact disclosed in the prosecution of the suit wherein such opinion was rendered that the usury laws of Texas are being flagrantly violated and unconscionable charges are being made by money lenders, and the fact that such practice is general in many parts of the State and that the present Statutes of Texas are inadequate to afford protection to the public generally against such unlawful and unconscionable practices, create an emergency," etc. It can hardly be gainsaid that the factual situation portrayed in this recital afforded ample justification for the Act as applied to this class of usurers. Even were the facts challenged, the legislative finding could not be overturned by the courts unless it were made to appear by conclusive proof that the finding was "clearly erroneous, arbitrary, or wholly unwarranted." Not only was such showing not made, but the following verified allegations of appellants' petition support the legislative finding:

"Walter Watts is, has been and expects to continue to be engaged in lending money for which he has been and is charging and collecting in excess of 10 per cent per annum. Since the 10th day of August, 1943,

he has made more than three such loans and expects to continue to make more than three such loans in each given six months period and to charge and collect interest thereon in excess of 10 per cent per annum on each such loan.

"Plaintiffs, other than Walter Watts, for a number of years just preceding the 10th day of August, 1943, were engaged in lending money for which they and each of them charged and collected in excess of 10 per cent per annum. During any six months period preceding August 10, 1943, they and each of them have made more than three such loans. Except for the provisions of Chapter 144, Acts of the Regular Session of the 48th Legislature and the threat and imminence of proceedings thereunder said plaintiffs would continue to lend money for which they and each of them would charge and collect interest in excess of 10 per cent per annum, and such loans so made by them and each of them would be, except for such Act, more than three in any six months period. By reason of the aforesaid Chapter 144, neither of said plaintiffs has made as many as three such loans for which they have charged or collected interest in excess of 10 per cent per annum since said Act became effective, namely, August 10, 1943.

* * * * *

"The business of the plaintiffs and each of them is such as to require that they daily make and collect loans, all of which are in small amounts, and they cannot make many such loans in the event they charge and collect no more than 10 per cent per annum interest. Many of their customers are persons who are unable to secure loans of money at an interest rate of 10 per cent per annum or less.

"Plaintiffs will suffer great and irreparable damage and injuries for which they have no adequate remedy at law unless this Honorable Court grants its most gracious writ of injunction as hereinafter prayed for."

A more brazen defiance of law could hardly be conceived than this quotation contains; and one must needs seek long and far to find its counterpart. It is a declaration that the laws penalizing usury are wholly ineffective as a preventive in so far as concerns the business conducted by the plaintiffs; and that the Loan Act is essential, if an effective preventive is to be applied. With the policy involved in our usury laws, it is not within the province of the courts to deal. That is a matter ordinarily addressing itself to the legislature. In this particular instance that policy is prescribed in the Constitution itself; which all properly disposed citizens should respect and at least endeavor to obey independently of penalties imposed for infractions of the law. It would hardly seem to lie in the mouth of confessed and defiant law breakers to claim that they had been discriminated against by the passage of a non-penal statute designed only to prevent them from continuing in their admittedly unlawful business, merely because there may be other classes of business in which usury is habitually practiced. But even conceding that a like situation existed in other classes of business, it would be necessary to show that fact by conclusive and irrefutable proof, in order to strike down as "clearly erroneous, arbitrary and unwarranted," the legislative classification. No proof of any character was offered on this issue. We cannot take judicial knowledge of the fact, if such it be, that the habitual practice of usury exists in other lines of business than money lending. But even were such fact established, it would not afford ground for striking down the legislative classification, absent a further conclusive showing that such practices in other businesses were fraught with consequences equally deleterious to the public interest as are those of the habitual money lending usurer. Neither the record nor common knowledge affords a basis for striking down the legislative classification. We do know as a matter of history that the practice of money lending usury constitutes one of the most ancient and constant forms of oppressing the poor; and that laws for its suppression and punishment have been promulgated by various nations from the earliest times. Some of these have been exceedingly severe, at times even including the death penalty.

While the foregoing principles, which fully uphold the validity of the Act as against the attack of unwarranted discrimination are so well established as to obviate the necessity of supporting authority, the following random quotations may not be amiss:

"If the class discriminated against is, or reasonably might be, considered to define those from whom the evil mainly is to be feared it may properly be picked out." Cooley on Const.Lim., Vol. 2, p. 813.

"We start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. * * * It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. * * * The state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.'" Mr. Justice Holmes in Patsone v. Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 282, 58 L.Ed. 539.

"A state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed. * * * If a class is deemed to present a conspicuous example of what the legislature seeks to prevent.'" Atwood v. State, 135 Tex.Cr.R. 543, 121 S.W.2d 353, 358.

"There is nothing in this record to indicate that the classifications and exemptions made * * * are arbitrary and unreasonable, and unless they are shown to be so, the Legislature has the power to make such classifications and exemptions." Berry v. McDonald, Tex.Civ.App. 123 S.W.2d 388, 389.

"The burden is upon appellants here to demonstrate at least that there is no distinction for classification purposes between the classes of persons participating in this character of activity for commercial purposes, and the exempted classes." Sportatorium v. State, Tex.Civ.App., 115 S.W.2d 483, 487.

For collation of pertinent authorities see James v. Gulf, Ins. Co., Tex.Civ.App., 179 S.W.2d 397.

The third ground of invalidity, above,—that the Act confers jurisdiction on the district court to grant injunctions at the instance of the State to protect purely private rights in violation of Const. Art. 5, Sec. 8—is predicated upon the proposition that since the Act does not create an offense nor expressly characterize the business of the habitual usurer as a nuisance, and since that business is not one which the courts, independently of legislative act, may declare to be a nuisance (Ex parte Hughes, above), the Act operates upon a purely private business in which the public has no interest, and is therefore violative of the stated article. Reliance in support of this ground is chiefly upon the case of Stockwell v. State, 110 Tex. 550, 221 S.W. 932, 12 A.L.R. 1116. That case clearly has no application here. The holding there is accurately stated in the following quotation from the syllabus:

"Except in case of emergency threatening public calamity and presenting imminent exigency before which all private rights must give way, the Legislature cannot confer on its administrative officers the power to finally determine that property of a citizen, not so declared by statute, constitutes a nuisance which should be abated by its destruction. Their decision cannot be made conclusive. The owner is entitled to a judicial determination of the question whether or not his property constitutes a nuisance.

"Proceeding under article 4459, Rev. Stats., inspectors of the Department of Agriculture pronounced a hedge belonging to S. to be infected with citrus canker, a contagious disease destructive of citrus fruit trees, constituting it a nuisance requiring destruction. On appeal to the Commissioner of Agriculture he sustained the ruling of the inspectors. S. refusing to destroy the hedge or permit agents of the department to do so, the Commissioner sued in behalf of the State to enjoin him from interfering with them in destroying it. The answer of S. put in issue the facts as to the hedge constituting a nuisance requiring destruction. Demurrer to this was sustained on the ground that the decision of the Commissioner was final. Held error. S. was entitled to a trial and judicial determination of the facts."

No analogy between the situation there and that here exists. Here nothing is delegated to the courts or administrative officials. The Act specifically denounces the business it defines as habitual practice of money lending usury, expressly declares the public interest in the subject, and provides a specific preventive, injunction against its further practice. It is not essential that the Act should have expressly denominated the practice as a nuisance. The decision in Ex parte Hughes [133 Tex. 505, 129 S.W.2d 274] is grounded upon the fact that "there is no law, constitutional or statutory, that defines the violation of

such laws as an injury to the property or civil rights of the public at large. To the contrary * * * our usury laws very carefully create only private rights." The following excerpts from the opinion clearly recognize the power of the legislature to pass the Act in issue: "Whether in the future the state shall be empowered to enjoin the business of money lending at usurious rates of interest under the conditions here shown addresses itself to the sound consideration of the Legislature."

And "Finally, we wish to say that we fully understand the humanitarian sentiment that moved the District Judge, the Attorney General, and the County Attorney in seeking to interpose the powers of a court of equity *to suppress the grievous wrongs that are being committed upon their unfortunate victims by unscrupulous money lenders*. In spite of this, the law provides no such remedy at the suit of the State, and for us to create it by judicial construction, would be to exceed our judicial powers, and invade the legislative prerogative. To do that would be to violate the plain mandate of our fundamental law." (Emphasis added.)

That decision was handed down in June 1939. The Loan Act was passed at the next regular session of the legislature (1943), containing the above-quoted reference to the Hughes decision in its emergency clause. We think there can be no serious question but that it was a valid exercise of legislative power.

The fourth ground of invalidity—that it violates the Federal Emergency Price Control Act of 1942—is clearly untenable. This point is predicated upon the fact that the Federal Act vests in the Price Administrator the authority to establish maximum prices for all commodities (money being embraced in that term); and (so reads the brief) "the fact that no maximum price has been fixed is evidence that none should be fixed." We do not think the Federal Act has the effect of suspending or annulling our state usury laws, or interferes with their enforcement; and we so hold, absent a specific authoritative Federal Court holding to that effect.

The fifth ground of invalidity is predicated upon the proposition that money lending "constitutes commerce in interstate trade, and the Congress has preempted this field by enacting the Sherman Anti-Trust Act"; citing the recent case of United States v. South-Eastern Underwriters, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440. The brief states: "We do not personally believe that money lending is 'trade or commerce,' much less 'interstate trade or commerce'; yet this court may take judicial knowledge of the fact that so eminent authority as the Attorney General of the United States has caused an indictment to be returned in the United States District Court for the Western District of Texas, San Antonio Division, against a number of the plaintiffs in this case, including, among others, L. Berry who resides in Texas and transacts business only in Texas. The indictment is based on an alleged conspiracy to fix rates of interest and charges in connection with the money lending business. * * * As heretofore stated, we must frankly say that we do not believe that this point is sound, and yet we feel impelled to present it to this court in view of the position taken and now being asserted by the Attorney General" in the cited instance.

With equal frankness, we concur in this asserted belief.

The next point complains of the action of the trial court in overruling a plea in abatement predicated upon the proposition that the suit authorized by the Act is a special proceeding and jurisdiction under Sec. 3 of the Act is conferred only on a district court in the county of a defendant's residence or in a county where a defendant conducts his money loaning business; none of the appellants either residing or doing business in Travis County. We think clearly that Sec. 3 is, as its language expressly imports, a venue and not a jurisdiction provision. Section 1, which confers the right of action, authorizes its bringing "in the District Court," without any restriction or limitation as to any particular district court.

The next point complains of the overruling of a plea in abatement to the cross-petition based upon alleged misjoinder of parties (appellants), none of whom resided or did business in Travis County. Appellants are in no position to abate or otherwise complain of their joinder in the cross-action, since they themselves joined in invoking the jurisdiction of the Travis County court in a single action. Moreover, abatement is not the appropriate procedure applicable to improper joinder of parties under the new rules (Texas Rules of Civil Procedure). This subject is treated

in detail in Rule 41. See in this connection Wilson v. Ammann, Tex.Civ.App., 163 S.W.2d 660 (error dis.); also construing Federal Rule 21, 28 U.S.C.A. following section 723c, from which our Rule 41 is taken in substance, Taiyo v. Northam, D.C., 1 F.R.D. 382; Diepen v. Fernow, D.C., 1 F.R.D. 378; Jennings v. Beach, D.C., 1 F.R.D. 442; Allegheny v. Maryland, D.C., 32 F.Supp. 297.

The above holdings dispose of the first fourteen of the thirty points in appellants' brief. The remaining sixteen deal with three general subjects: (1) the sufficiency of the evidence to support the judgment; (2) various criticisms of the court's charge; and (3) limitation of certain testimony to impeachment purposes. We have carefully examined each of these points and have reached the conclusion that none of them is well taken. Consequently they are overruled. However, we have reached the further conclusion that under admissions of appellants noted below, the State was entitled as a matter of law to the injunction decree independently of the correctness of the rulings challenged in these sixteen points. It will not be necessary, therefore, to give a detailed discussion of these points; we will, however, give the substance of appellants' several contentions.

Upon the issue of the sufficiency of the evidence to support the judgment the points made are to the effect that there was no probative evidence that any of the appellants (other than Watts) had made as many as three usurious loans within the six month period preceding filing the cross-action. As to the evidence on this issue the appellants may be divided into four classes: (1) those as to whom three or more loans were proved in the six month period under a plan by which a note was given for the amount of the loan and a collateral agreement executed whereby the borrower agreed to pay an additional sum, far in excess of $1 for each $50 of the loan or fraction thereof to cover expense of making the loan; (2) those as to whom three or more loans were made under a plan by which the lender purported to act as agent for the borrower in obtaining a loan from a stated bank. The note for the amount of the loan was made to the bank and the loan completed by draft drawn by the borrower on the bank, endorsed by the borrower and cashed by the lender. Another instrument was signed by the borrower in which he agreed to pay the lender a certain sum (far in excess of $1 per $50 or fraction thereof of the amount of the loan) as compensation for procuring the loan; (3) those as to whom only one or two loans were proved under either plan 1 or 2, above; and (4) those as to whom no specific loan was proved.

The contentions in this regard are in substance as follows:

The burden was on the State to show as to each appellant that he had made as many (1) as three loans in the six month period; (2) that each of such loans was usurious; (3) that the charge for expense was in fact to cloak the charge of usurious interest; (4) that plan 2 was not a bona fide agency arrangement. In the abstract it may be conceded that each of these contentions states a correct proposition of law. As to the issue concerning the bona fides of the service charge, we think under the Act itself the burden was met by showing that the charge was in excess of $1 for $50 of loan or fraction thereof. Such proof would at least cast the burden upon the lender of showing that the service charge was such in fact and was reasonable.

We hold that the burden of proof resting upon the State in the particulars stated was met in each of the four situations above, under admissions made by the several appellants.

In addition to those contained in their pleadings and quoted above, each of the 29 appellants, under disclosure proceedings requested by the State, made the following admissions:

"1. You are now engaged in the business of making small loans in Texas, and have been so engaged for the past several years. A. Admit.

"2. You are not incorporated, but act as an individual in conducting your business. A. Admit.

"15. For business reasons (or other reasons) your books, notes, and other records of loans made by you do not disclose that you charge and collect usury upon your loans made. A. Admit.

"17. You are still doing business at the same stand at which you carried on prior to August 10, 1943. A. Admit.

"18. You expect and intend to continue your business in the future, as usual, un-

less you are prevented by a court writ or order. A. Admit."

Not only were these admissions and those contained in their pleadings sufficient to establish factually that appellants and each of them were still engaged in the business of habitually lending money at usurious rates, and dispensed with further proof of specific acts; but clearly, we think, entitled the State to the injunctive relief authorized by the Act as a matter of law. As already stated the Act imposes no penalty for violation of the usury laws; it merely affords a remedy designed to prevent violation of those laws in the future. Each appellant having solemnly admitted: that he was engaged in habitual money lending usury up to the effective date of the Act; that he would continue such practice but for the Act and threat of proceedings thereunder; that he could not conduct his business without violating the usury law; that he would suffer irreparable injury if enforcement of the Act were not enjoined; that his books, etc., do not disclose that he charges or collects usury; that he is still doing business at the same stand as prior to August 10, 1943; and that he expects and intends to continue the business "in the future, as usual, unless * * * prevented by a court writ or order";—the court was warranted in passing the decree.

The criticisms of the court's charge to the jury assert error in the following particulars:

1. In charging on the "real bona fide intention of the parties" as it did.

2. In inquiring if cross-defendants were "engaged in the business of habitually loaning money."

3. In charging on circumstantial evidence.

4. In its definition of circumstantial evidence.

5. In defining the terms "actual" and "necessary".

6. In its definitions of (1) "actual", (2) "necessary", and (3) "interest".

As stated we have carefully considered each of these issues and find no reversible error therein. However, under our above holding, error, if any, would be harmless.

The remaining point is "to the effect that the court erroneously limited certain testimony to impeachment purposes." The charge complained of reads: "During the trial of this case certain evidence was admitted to show that the borrower who had testified by deposition obtained the loan at the instigation of another person for the purpose of testifying in this case, and was reimbursed by this person for the cost of the loan. You are instructed that such evidence was admitted for the sole purpose of impeaching the credibility of the borrower as a witness, if in your judgment it has such effect, and you will not consider it for any other purpose whatsoever."

Clearly we think this charge was correct. But if erroneous it was harmless for the reason already stated.

In a counter-point the State urges that "appellants were not entitled to the relief sought by them for a declaratory judgment and injunction in this case since they possessed no justiciable interest in the subject matter of the suit."

All of the questions upon which appellants sought adjudication under the Uniform Declaratory Judgment Act were raised by them in their answer to the State's cross-bill, and their adjudication was essential to the decree rendered in favor of the State. It is therefore immaterial that the court adjudicated them under appellants' prayer for a declaratory judgment thereon. Consideration of this counter-point is therefore not essential.

The trial court's judgment is affirmed. Affirmed.