**SWEATT v. PAINTER et al.**

No. 9684.

Court of Civil Appeals of Texas. Austin.

Feb. 25, 1948.

Rehearing Denied March 17, 1948.

W. J. Durham, of Dallas, and Thurgood Marshall, of New York City, for appellant.

Price Daniel, Atty. Gen., and Jackson Littleton and Joe Greenhill, Asst. Attys. Gen., for appellees.

McCLENDON, Chief Justice.

February 26, 1946, Heman Marion Sweatt, a Negro, applied for admission to the School of Law of the University of Texas, as a first year student. Admittedly, he possessed every essential qualification for admission, except that of race, upon which ground alone his application was denied, under Sec. 7 of art. 7 of the Texas Constitution, Vernon's Ann.St., which reads: "Separate schools shall be provided for the white and colored children, and impartial provision shall be made for both."

May 16, 1946, he filed this suit, as Relator, for a writ of mandamus, against the President, members of the Board of Regents, Dean of the School of Law, and Registrar of the University of Texas, as Respondents, to compel his admission, upon the ground that its denial constituted an infringement of rights guaranteed to him under the equal protection clause of the Fourteenth Amendment to the Federal Constitution. In a trial to the court the sought relief was denied and Relator has appealed.

At the outset it should be borne in mind that the validity of state laws which require segregation of races in state sup-

ported schools, as being, on the ground of segregation alone, a denial of due process, is not now an open question. The ultimate repository of authority to construe the Federal Constitution is the Federal Supreme Court. We cite chronologically, in a note below, the unbroken line of decisions of that tribunal recognizing or upholding the validity of such segregation as against such attack.[1]

The gist of these decisions is embodied in the following excerpts from the opinion in Plessy v. Ferguson (Mr. Justice Brown[2] writing):

"The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have . been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation, in places where they are liable to be brought into contact, do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which have been held to be a valid exercise of the legislative power even by courts of states where the political rights of the colored race have been longest and most earnestly enforced.

.*　　.*　　*　　.*　·　*　　*

"The distinction between laws interfering with the political equality of the negro and those requiring the separation of the two races in schools, theaters, and railway carriages has been frequently drawn by the courts."

This holding had the express approval of Mr. Justice Harlan in the Cumming case, of Mr. Justice Taft in the Gong Lum case, and of Mr. Chief Justice Hughes in the Canada case. Its approval is implicit in the latest enunciation of that court on the subject (January 12, 1948) in the Sipuel case.

Relator's brief asserts:

"The record in the instant case for the first time presents testimony and documentary evidence clearly establishing that:

"(1) There is no rational basis for racial classification for school purposes.

"(2) Public schools, 'separate but equal' in theory are in fact and in practical administration consistently unequal and discriminatory.

"(3) It is impossible to have the equality required by the Fourteenth Amendment in a public school system which relegates citizens of a disadvantaged racial minority group to separate schools."

And further:

"The doctrine of racially 'separate but equal' public facilities is merely a constitutional hypothesis which has no application where racial segregation is shown to be inconsistent with equality."

*　　*　　*　　*　　*　　*

"Although separate school laws have been enforced by several states, an exami-

---

[1] Hall v. DeCuir, 1878, 95 U.S. 485, 24 L.Ed. 547; Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 1140, 41 L.Ed. 256; Cumming v. County Board of Education, 1899, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262; McCabe v. A. T. & S. F. R. Co., 1914, 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169; Gong Lum v. Rice, 1927, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172; Missouri v. Canada, 1938, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208; Sipuel v. Oklahoma, 1948, 68 S.Ct. 299, 92 L.Ed.

——.

A like uniformity is to be found in decisions of other Federal and State Courts. Their citation is not of importance here.

[2] Mr. Justice Henry Billings Brown was born in Lee, Massachusetts, March 2, 1836. His academic education was at Yale, and among his fellow students were Chauncey M. Depew and his later associates on the Supreme bench, Mr. Justice Brewer and Mr. Justice Shiras. His education in law was obtained at Yale and Harvard. In 1859 he moved to Michigan, where he practiced law until 1861. He then served as Deputy U. S. Marshal and Assistant District Attorney until 1868, when he became Judge of the Wayne County Circuit Court. In 1875 he was appointed U. S. District Judge by President Grant, and in 1890 Associate Justice of the U. S. Supreme Court by President Benjamin Harrison.

nation of the cases in the United States Supreme Court and lower courts will demonstrate that these statutes have never been seriously challenged nor their validity examined and tested upon a record adequately presenting the critical and decisive issues such as are presented by the record in. this case:

"(1) Whether there is a rational basis for racial classification for school purposes.

"(2) Whether public schools, 'separate but equal' in theory are in fact and practical administration consistently unequal and discriminatory.

"(3) Whether it is possible to have the equality required by the Fourteenth Amendment in a public school system which relegates citizens of a disadvantaged racial minority group to separate schools."

Implicit in these quotations is the assertion that race segregation in public schools, at least in the higher and professional fields, inherently is discriminatory within the meaning of the Fourteenth Amendment, and cannot be made otherwise.

This assertion in effect impeaches the soundness of the various decisions of the Federal Supreme Court which hold to the contrary, as being predicated upon a purely abstract and theoretical hypothesis, wholly unrelated to reality. To so hold would convict the great jurists who rendered those decisions of being so far removed from the actualities involved in the race problems of our American life as to render them incapable of evaluating the known facts of contemporaneous and precedent history as they relate to those problems.

It is of course of the very essence of the validity of segregation laws that they provide for each segregated group or class facilities and opportunities the equivalent, or (as often stated) substantial equivalent of those provided for the other group or class. Our constitution (quoted above) so provides. The brief asserts that there can be no "substantial equality," the two words being in themselves incompatible. This is of course true in pure, as distinguished from applied, mathematics. "Equality" like all abstract nouns must be defined and construed according to the context or setting in which it is employed. Pure

mathematics deals with abstract relations, predicated upon units of value which it defines or assumes as equal. Its equations are therefore exact. But in this sense there are no equations in nature; at least not demonstrably so. Equations in nature are manifestly only approximations (working hypotheses); their accuracy depending upon a proper evaluation of their units or standards of value as applied to the subject matter involved and the objectives in view. It is in this sense that the decisions upholding the power of segregation in public schools as not violative of the Fourteenth Amendment, employ the expressions "equal" and "substantially equal" and as synonymous. The framers of the Texas constitution of 1876 recognized the necessity (both inherent and under the 14th Amendment) of "equal protection" in the must (shall) requirement (art. 7, Sec. 7) of "impartial provision" for "both" races. The question, and we think the controlling one, which this appeal presents is whether under the record showing in this case the State at the time of the trial had provided and made available to Relator a course of instruction in law as a first year student, the equivalent or substantial equivalent in its advantages to him of that which the State was then providing in the University of Texas Law School. We are not dealing here with abstractions but with realities.

In the latter portion of Relator's brief the following proposition is asserted: "The expert testimony introduced at the trial establishes that there is no rational justification for segregation in professional education and that substantial discrimination is a necessary consequence of any separation of professional students on the basis of color."

The supporting evidence deals generally with the subject of race segregation in professional and other schools from biological and other viewpoints, giving conclusions of scientists, educators and other experts in the several fields, and data compiled and conclusions reached in reports of surveys, etc. In so far as this evidence is directed against the policy of segregation the subject dealt with is outside the judicial function. The people of

446

Texas, through their constitutional and legislative enactments, have determined that policy, the factual bases of which are not subjects of judicial review. See Watts v. Mann, Tex.Civ.App., 187 S.W.2d 917, error refused; 11 Am.Jur., §§ 142–144, pp. 82, et seq. The only appropriate judicial inquiry here is whether the facilities furnished and made available by the State to Relator as an applicant for a first year law course meet the test of due process under the Fourteenth Amendment.

Nor are we concerned here with whether the State has discharged its obligations under that amendment in other segregated fields or branches of education.

■ For these reasons we hold that the trial court correctly excluded: (1) Relator's pleadings as to what happened at Prairie View in 1937 (Relator's first point); (2) evidence of Dr. Thompson regarding facilities at other state institutions and colleges (Relator's second point); and (3) evidence of Donald Murray regarding what happened at the University of Maryland in 1929-32 (Relator's third point).

■ The record shows that this cause was called for trial June 17, 1946, and after a hearing the court passed an interlocutory order, which, after reciting the (below) 1945 Act, provided that, if by December 17, 1946, "a course for legal instruction substantially equivalent to that offered at the University of Texas is established and made available to the relator within the State of Texas in an educational institution supported by the State, the writ of mandamus sought herein will be denied, but if such a course of legal instruction is not so established and made available, the writ of mandamus will issue." The cause was ordered held on the docket until December 17, 1946, on which date final judgment was entered denying the writ, upon a showing by Respondents that the A & M (Texas Agricultural and Mechanical College) Board had provided for a first year law school at Houston to open with the February 1947 semester, as a branch of Prairie View University. This judgment was set aside by this court March 26, 1947, and the cause remanded generally, without prejudice to the rights of either party, upon agreement of counsel in open court. Thereafter (May 17-June 17, 1947) the cause was again tried, the judgment denying the writ, upon the specific finding by the court that in compliance with the Act of 1947 (noted below) the Respondents: " * * * have established the School of Law of the Texas State University for Negroes in Austin, Texas, with substantially equal facilities and with the same entrance, classroom study, and graduation requirements, and with the same courses and the same instructors as the School of Law of The University of Texas; that such new law school offered to Relator privileges, advantages, and opportunities for the study of law substantially equivalent to those offered by the State to white students at the University of Texas; that Relator, although duly notified that he was eligible and would be admitted to said law school March 10, 1947, declined to register; that from his own testimony, Relator would not register in a separate law school no matter how equal it might be and not even if the separate school affords him identical advantages and opportunities for the study of law equal to those furnished by the State to the white students of the Law School of the University of Texas; and the constitutional right of the State to provide equal educational opportunities in separate schools being well established and long recognized by the highest State and Federal Courts, and the facts in this case showing that Relator would be afforded equal if not better opportunities for the study of law in such separate school, the petition for Writ of Mandamus should be denied."

The sufficiency of the evidence to support these findings and conclusions to the extent that the stated facilities provided by the State meet the requirements of due process, constitutes the controlling question in the case; upon which issue the record shows: Relator's application was the first ever made by a Negro for admission to the University of Texas Law School. It also appears to have been the first application of any Negro for admission to any other department or school of the University of Texas. The Prairie View Normal and Industrial School for Negroes was established in the 1870's, and was operated under the governing

board of the A. & M. Neither Prairie View nor any other state supported school for Negroes offered any courses in law. The name of Prairie View was changed by the Act of June 1, 1945, to Prairie View University; and it was provided: "Whenever there is any demand for same, the Board of Directors of the Agricultural and Mechanical College, in addition to the courses of study now authorized for said institution, is authorized to provide for the establishment of courses in law, medicine, engineering, pharmacy, journalism, or any other generally recognized college course taught at the University of Texas, in said Prairie View University, which courses shall be substantially equivalent to those offered at the University of Texas." Acts 49th Leg., Ch. 308, p. 506, Vernon's Ann.Civ.St. art. 2643a.

The Act of 1947, S.B. 140, Ch. 29, Acts 50th Leg., Vernon's Ann.Civ.St. art. 2643b, was passed and became effective March 3, 1947. It provided (inter alia) for the establishment of "The Texas State University for Negroes" to be located at Houston, with a governing board of nine "to consist of both white and negro citizens of this state," and appropriated $2,000,000 for land, buildings and equipment, and $500,000 per annum for maintenance for the biennium ending August 31, 1949. And that: "The Texas State University for Negroes shall offer all other courses of higher learning, including, but without limitation, (other than as to those professional courses designated for The Prairie View Agricultural and Mechanical College), arts and sciences, literature, law, medicine, pharmacy, dentistry, journalism, education, and other professional courses, all of which shall be equivalent to those offered at The University of Texas. Upon demand being made by any qualified applicant for any present or future course of instruction offered at The University of Texas, or its branches, such course shall be established or added to the curriculum of the appropriate division of the schools hereby established in order that the separate universities for Negroes shall at all times offer equal educational opportunities and training as that available to other persons of this state." Vernon's Ann.Civ.St. art. 2643b, § 2.

And further: "Sec. 11. In the interim between the effective date of this Act and the organization, establishment and operation of the Texas State University for Negroes at Houston, upon demand heretofore or hereafter made by any qualified applicant for instruction in law at the University of Texas, the Board of Regents of the University of Texas is authorized and required to forthwith organize and establish a separate school of law at Austin for negroes to be known as the 'School of Law of the Texas State University for Negroes' and therein provide instruction in law equivalent to the same instruction being offered in law at the University of Texas. The Board of Regents of the University of Texas shall act as the governing board of such separate law school until such time as it is transferred to the control of the Board of Directors of the Texas State University for Negroes." Vernon's Ann.Civ. St. art. 2643b note.

For this latter purpose $100,000 was appropriated.

Pursuant to this Act the school for first year Negro law students was established at Austin. Relator was notified amply in advance of its opening on March 10, 1947, but did not and has not attended. A résumé of the evidence showing the facilities, opportunities and advantages afforded by this school and a comparison thereof with those afforded by the University of Texas School of Law is set forth in an appendix to this opinion, 210 S.W.2d 448, copied in the main from Respondents' brief, and approved and adopted by us as a fair statement of the evidence in this respect.

The evidence shows, on the part of the State of Texas, an enormous outlay both in funds and in carefully and conscientiously planned and executed endeavor, in a sincere and earnest bona fide effort to afford every reasonable and adequate facility and opportunity guaranteed to Relator under the Fourteenth Amendment, within the State's settled policy (constitutional and statutory) of race segregation in its public schools. We hold that the State has effectually accomplished that objective.

The trial court's judgment is affirmed.

Affirmed.

On Appellant's Motion for Rehearing.

Point VII in the motion complains that this court "erred in ignoring testimony introduced by appellant and merely adopting appellees' interpretation of the evidence by attaching to its opinion, an appendix copied in the main from appellees' brief, and based its opinion and judgment on said appellees' brief, without making an independent evaluation of the record as to the comparative values of the two law schools as a basis for its opinion and judgment."

Implicit in the statement in our opinion that the résumé of evidence set forth in the appendix was "approved and adopted by us as a fair statement of the evidence" in the stated respect, was the assertion (which we now make explicit) that we had made "an independent evaluation of the record as to the comparative values of the two law schools as a basis for its (our) opinion and judgment," and that from this "independent evaluation" we reached the conclusion and so held that the statement in the appendix contained a fair résumé of the pertinent evidence, which we approved and adopted as our own.

It should always be held in mind that the members of this court are not the triers of fact. That is the function of the trial court. This court is one of review only. Where there is no evidence of sufficient probative value to support a judgment, we have the power to set it aside and render the judgment which the trial court should have rendered. We also have the power (when our jurisdiction in that regard is properly invoked) to set aside a judgment and order a new trial on the facts, where the evidence so greatly preponderates against the judgment as, in our opinion, to require that it be set aside in the interest of justice. Our jurisdiction in this latter regard was not invoked in this case. See Wisdom v. Smith, Tex.Sup., 209 S.W. 2d 164; Hall Music Co. v. Robertson, 117 Tex. 261, 1 S.W.2d 857; Phillips v. Anderson, Tex.Civ.App., 93 S.W.2d 171. However, we have carefully considered the evidence from that viewpoint as well as from that of its sufficiency as a matter of law; and were our jurisdiction in that regard properly invoked we would be constrained to hold that its preponderance and overwhelming weight support the trial court's judgment and the specific fact findings therein which are quoted in our original opinion; if in fact it does not conclusively do so, as a matter of law.

The motion is overruled.

Overruled.

### Appendix.

Breaking the elements of the School of Law into component parts, the following evidence was deduced.

### Entrance, Examination, Graduation, and Similar Requirements.

The requirements for admission and fees, and regulations relating to classification of students, classwork, examinations, grades and credits, standards of work required, and degrees rewarded are exactly the same as those published in the latest published catalogue of The University of Texas and used at such institution.

### The Faculty

The instructors at the School of Law of the Texas State University for Negroes were and are the very same professors which had taught or were teaching the same courses at The University of Texas Law School. They were the same instructors Sweatt would have had if he had been enrolled in The University of Texas. The instructions from the Board of Regents were to use all of the faculty of the University Law School, so far as necessary, in order to maintain a full curriculum at the Negro Law School until four more full-time professors could be employed for the Negro Law School. The budget provided for four professors at $6,000 per year—the same pay base for professors at The University of Texas. Each of the instructors devotes all of his time to teaching—each a full-time professor. None are engaged in the private law practice. With the small enrollment at the Negro Law School, the instructors would be more available to the students for consultation then they would be to students at The University of Texas with its large class of 150 to 175 students. The Dean and Registrar of the two law schools were respectively the same persons.

## Curriculum

The curriculum at the Negro Law School and at The University was exactly the same; it was the same as that adopted in the latest University of Texas School of Law Bulletin. The courses offered beginning students at the Negro Law School were identical with those offered beginning students at the University: Contracts, Torts and Legal Bibliography. These courses, with the same professors, are set out in Respondent's Exhibit 7.

## Classroom

The classroom requirements were identical. With much smaller classes, the Negro Law School would provide the student with the opportunity to personally participate in classroom recitations and discussions. In an average law class at The University of Texas Law School, an average student would be called upon to recite only an average of 1½ times a semester. In a smaller class the students would receive better experience and education; they would be called on more frequently, would be more "on their toes". The students would come to class better prepared because their chances of being called upon are much greater; there would be a greater pressure to keep up their daily work. Dean Mc-Cormick testified that "in the Negro Law School he (Sweatt) would have gotten a good deal more personal attention from the faculty than he would have had he been in the large entering class in The University of Texas."

## Library

At the time of trial, there were on hand in the School of Law of the Texas State University for Negroes books customarily used by the first-year class of the University, and other books which Miss Helen Hargrave, Librarian of the University Law School, thought would be useful. There were about 200 of these books. There were also available for transfer to the Negro Law School between 500 and 600 books from the University, plus gifts of between 900 and 950 books. In addition, the entire library of the Supreme Court of Texas was specifically made available to the Negro Law School by Section 11 of H. B. 240, Acts 50th Legislature [Vernon's Ann.Civ.

St. art. 2643b note]. The Supreme Court Library is located in the State Capitol Building on the second floor. The Capitol grounds are some 20 feet from the Negro Law School, and the entrance is only about 300 feet from that School.

The Supreme Court Library contains approximately 42,000 volumes, which number is far in excess of the 7,500-book minimum requirement of the American Bar Association. Excluding duplicates, The University of Texas Law Library contains 30,000 to 35,000 books. Counting duplicates, it contains around 65,000. These books serve 850 law students of The University of Texas.

In some respects the Supreme Court Library is stronger than that of the University. Being a Governmental Depository, the Supreme Court Library automatically receives many reports, such as those of administrative bodies. It is the strongest library in the South on State Session Laws. It contains Attorney General's Opinions, Tax Board Opinions, Workmen's Compensation Reports, and other items not carried by the University. The Supreme Court Library is more spacious for a student body of ten students than are the facilities at The University of Texas Law School Library, which are exceedingly crowded. There is no more confusion, and in most instances, less confusion in the Supreme Court Library than at the Law Library at the University because of the large number of persons using the latter.

On the other hand, the Supreme Court Library does not have as many textbooks, legal periodicals, or English reports as the University Law Library. The Court's Library contains the Harvard, Columbia, Yale, and Texas Law Reviews, and the American Bar Association Journal. It has the English Reports up to 1932. The Law Library of The University of Texas and that of the Supreme Court are substantially equal except for the texts, legal periodicals, and English Reports.

However, all of such texts, legal periodicals, and English Reports, not available in the Supreme Court Library, are readily available to the Negro Law School on a

loan basis from the Law Library of The University of Texas.

In addition to the books in the Negro Law School and in the Supreme Court Library, and those available on a loan basis from the Law Library of The University of Texas, a complete law library is being procured, consisting of some 10,000 law books, some of which are already available. The rest have been placed for order through the Board of Control for the School of Law of the Texas State University for Negroes. The list of the 10,008 books which will constitute the Negro Law School Library is set out in Respondent's Exhibit No. 8. Of such number 1,281 are immediately available, and 8,727 books were already requisitioned. Bids had already been requested on the 8,727 books requisitioned, and 23 bids were received. Orders have already been placed for 5,702 of the books, all deliverable within ten to sixty days. Wherever new books were available, they were ordered; second-hand books were only ordered where new ones were not available. The library requisitioned included 20 Law Reviews, Indices of legal periodicals, Citators, Digests, Restatements, textbooks, statutes, the complete West Publishing Company Reporter System, etc. The undisputed evidence is that the books ordered for the Negro Law School are sufficient to meet the requirements of the American Association of Law Schools.

### The Physical Facilities.

. Whereas The University of Texas Law School has 3 classrooms for 850 students, the School of Law of the Texas State University of Negroes has two classrooms, plus a reading room, toilet facilities, and an entrance hall, for a much smaller student body. The two law schools possess approximately .the same facilities for light and ventilation, ("There are ample windows and lights.") though most law schools, including The University of Texas, need artificial light in the daytime. The Negro Law School, assuming a class of 10 students, has a greater floor space per student.

The location of the Negro Law School is particularly good. It is directly north of the State Capitol, separated only by a 20-foot street. It is within 100 yards of the Supreme Court of Texas, the Court of Civil Appeals, the Attorney General's Office, and the Legislature. It is between the business district of Austin and The University of Texas—8 blocks south of the University, and hence 8 blocks nearer the business district.

The building housing the Negro Law School is a three-story building of brick construction. The first floor was occupied by the School at the time of trial, but the upper two stories of the building were available as needed. Before March 10, 1947, the premises were cleaned up and painted. The building has ample space to house the 10,000 volume library and leave sufficient space for classrooms and reading room.

Hon. D. A. Simmons, President of the Texas Bar Association 1937-38; President of the American Judicature Society 1940-1942; and President of the American Bar Association 1944-1945, testified: "In my opinion, the facilities, the course of study, with the same professors, would afford an opportunity for a legal education equal or substantially equal to that given the students at The University of Texas Law School."

Hon. D. K. Woodward, Jr., Chairman of the Board of Regents of The University of Texas, testified:

"What we set up there was a plant fully adequate to give the very best legal instruction for the only man of the Negro race who had ever applied for instruction in law at the University in about 63 years of the life of the School."

\* \* \* \* \* \*

"I am talking as a man familiar with what it takes to provide a thorough training in law in the State of Texas, and I stated the facts within my own personal knowledge, that the facilities which the Board of Regents of the University set up in accordance with Senate Bill 140 are such as to provide the Relator in this case the opportunity for the study of law unsurpassed any time elsewhere in the State of Texas, and fully equal to the opportunity and instruction we are offering at the University any day."

Hon. Charles T. McCormick, Dean of the University of Texas Law School and President of the Association of American Law Schools, 1942, testified that the facilities at the Law School for Negro citizens furnished to Negro citizens an equal opportunity for study in law and procedure; that considering the respective use by the respective number of students, the physical facilities offered by the Negro Law School were substantially equal to those offered at The University of Texas Law School; and that: "I would say * * * the Negro student has at least equal and probably superior facilities for the study of law."

With reference to the membership requirements of the Association of American Law Schools, it was shown that the Negro Law School, at the time of this trial, met the great majority of the 9 requirements:

(1) It is a school not operated as a commercial enterprise, and the compensation of any officer or member of its teaching staff is not dependent on the number of students or the fees received.

(2) It satisfies the entrance requirements, i. e., pre-legal training, etc.

(3) The school is a "full-time law school." The school work is arranged so that substantially the full working time of the student is required at the school.

(4) The conferring of its degrees is conditioned upon the attainment of a grade of scholarship attained by examinations.

(5) No special students are admitted. In this, the School's requirement is stronger than that of the Association, which permits such students under certain considerations.

(6) The 10,000 volume library ordered for the School is sufficient to meet the library requirements. The selection of the books is such as to conform with the Association's requirements. In addition, the Supreme Court Library of 40,000 volumes is available, plus loan privileges from the Law Library of the University of Texas.

(7) The seventh requirement is that the "faculty shall consist of at least four full-time instructors who devote substantially all of their time to the work of the school." The professors in this case are full-time professors in the sense that all of their time is devoted to teaching. However, all of their teaching is not done at the Negro school; they will also be teaching at the University.

(8) Provision has been made for keeping a complete and readily accessible individual record of each student.

(9) The requirement reads, "It shall be a school which possesses reasonably adequate facilities and which is conducted in accordance with those standards and practices generally recognized by member schools as essential to the maintenance of a sound educational policy." Dean McCormick testified that in his opinion the Negro Law School met this requirement.

The testimony was that a two-year period is generally required before any law school may be admitted to membership in the Association of American Law Schools. Dean McCormick testified that he knew of no reason why the Negro Law School could not comply with all of those standards within that two-year period—before any entering student could graduate from the school.