## INDEPENDENT LUMBER CO. v. GULF STATE BANK.  (No. 8988.)*

Court of Civil Appeals of Texas. Galveston. May 30, 1927.

Rehearing Denied Oct. 13, 1927.

I. Usury ⊚⇒53—Bank's discounting of notes at 16 per cent., including 8 per cent. charge for inspection of collateral, held usurious (Rev. St. 1925, arts. 5069, 5071, 5073).

Bank's discounting of notes of company engaged in financing construction of houses at 16 per cent., 8 per cent. of which was to cover charges for inspection of liens given as collateral, *held* to constitute charge of excessive interest, under Rev. St. 1925, arts. 5069, 5071, 5073, entitling maker of notes to recover twice amount of interest charged, where maker received no additional benefit, and inspection

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error refused January 4, 1928.

charge merely represented slight-incidental expense and trouble to bank in carrying loan.

**2. Usury ⬤═▷26—Bank's discount charge, representing compensation for use, forbearance, or detention of money, is "interest," within usury statutes (Rev. St. 1925, arts. 5069, 5071, 5073).**

Bank's deduction of portion of loan as discount involves charge of interest, within usury statutes (Rev. St. 1925, arts. 5069, 5071, 5073), if it represents compensation for the use, forbearance, or detention of money.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interest (on Money).]

**3. Usury ⬤═▷16—Transaction alleged to be usurious should be tested by its substance, not by its form.**

Alleged usurious transaction is to be tested by its substance, not by its form, in determining whether greater rate of interest was charged than is allowed by law.

**4. Appeal and error ⬤═▷842(1)—Jury's contrary verdict is immaterial, where only one reasonable inference can be drawn from undisputed facts.**

Where only one reasonable inference can be drawn from undisputed facts in case, it is immaterial that jury returned contrary verdict.

**5. Usury ⬤═▷142(4)—Evidence held insufficient to sustain verdict that bank charging additional inspection fee for loan did not exact usury (Rev. St. 1925, arts. 5069, 5071, 5073).**

In action under Rev. St. 1925, arts. 5069, 5071, 5073, to recover double amount of alleged usurious interest charged by bank adding inspection charge to regular discount on making loan, evidence *held* insufficient to sustain jury's verdict that bank did not collect greater rate of interest than 10 per cent.

Appeal from District Court, Harris County; Ray F. Campbell, Judge.

Action by the Independent Lumber Company against the Gulf State Bank. Judgment for defendant, and plaintiff appeals. Reversed and rendered.

Woods, John & Co., of Houston, for appellant.

Vinson, Elkins, Sweeton & Weems, and Fred R. Switzer, all of Houston, for appellee.

GRAVES, J. On a series of loans to the lumber company and to T. E. Johnson—its predecessor in the business, as well as its assignor of any resulting claim in him as for usury—the bank collected a 16 per cent. per annum return on the sums loaned, aggregating upon them all $3,778.63. The suit by the lumber company was to recover double that amount, on the claim that it was usurious, pursuant to R. S. arts. 5071 and 5073.

The bank, in defense, relied on the averment that, of the 16 per cent. collected, only 8 per

cent. was charged for the use of the money; the other 8 per cent. being for inspection and appraisal fees upon property put up as collateral, which fees were charged by it in good faith and with no intention of evading the usury statutes of the state.

On the jury's verdict to the effect that the bank did not collect a greater rate than 10 per cent. per annum as compensation for the use or detention of the money so loaned, judgment was entered in its favor, and the lumber company appeals.

The material and undisputed facts were these:

The lumber company, at the inception of these loans a concern owned and operated by T. E. Johnson as an individual, but soon thereafter becoming a corporation managed by him as president—was engaged in retailing lumber to, and financing, contractors in the construction of homes and other buildings in the city of Houston and its environs, upon mechanics' and other kinds of liens on the property. It, in turn, always acting through Mr. Johnson, borrowed the money required as these buildings progressed from the appellee, assigning as collateral the liens it so held against the contractors. The lumber company, on the bank's requirement, first separately paid the bank's attorneys for doing the necessary legal work, inclusive of the examination of the titles furnished, and then from time to time gave its so secured notes to the bank for the full amount of each loan, payable at fixed maturity periods of short duration, usually 60 days, and providing for interest at the rate of 10 per cent. per annum from maturity. At the same time, through an enforced agreement as concerned Mr. Johnson's side of it, he protesting that it was exorbitant, a deduction at the rate of 16 per cent. per annum on the amount of each note for the detention period was invariably made in advance, whether the loans thereby evidenced were originals or renewals, and the lumber company's account with the bank, which did all its business, was credited with the face value of the note "less discount," as it was termed, in each and all instances amounting to this 16 per cent. All the loans here involved were paid in full, and, as at first stated, the returns or "discount" so exacted upon them amounted in all to $3,778.63.

As part of this agreement to make the loans on the 16 per cent. "discount" basis, it was at the time understood between the parties that prior inspections of the property so securing them were to be made by the bank, and, while Mr. Johnson denies that anything was ever said as to there being any charge for that service, insisting that his interest rate was merely contemporaneously raised from 10 to 16 per cent. per annum, in deference to the jury's verdict, this version by Mr. Marx, vice president of the bank, must be accepted

---

⬤═▷For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

as what occurred with reference to that feature:

"He (Johnson) told us to consider some way that he could finance, and I said, unless you care to pay a fee for the purpose of the inspections, 'We prefer not to have your business,' and in line with that what I thought was a reasonable fee I said, 'I would rather you make some suggestion for the reason that your manner of doing business has not in the past, or was not what it ought to have been with us,' and he said he preferred that we set that fee, and I told him we would not do that, and, after a discussion with him, he asked whether we thought, in view of the fact of his loans being a short time, we would be satisfied with a fee based on an amount equal to the amount of interest we collected on the loan, based on 8 per cent., and I submitted that matter to our committee, and we thought, in view of making the inspections and having our attorney to assign the papers, we concluded that would be a reasonable fee, and we based it on the amount of trouble in order to carry that type of loan. That was the plan under which we did business. He told me when I mentioned to him the fact that our discount committee agreed that was a reasonable charge, he was very much pleased, and I told him we would go into that line of handling his account, which we did. We continued to carry it like that until the time of his withdrawal of his business from our bank."

He added:

"One 8 per cent. was chargeable as interest and the other additional 8 per cent. covered inspection charges only, and nothing else. It was our purpose to only charge him a reasonable fee for the inspections, for the time that Mr. Schwartz was taken away from the bank, that was an inspection charge and no more."

"Our plan was to charge 8 per cent. on every dollar whether it was the original or the renewal. We reserved the right to make any additional inspections that we wanted to make. We had the right to make an inspection whenever we saw fit. If we decided it was not necessary to make an inspection, we did not make it.".

"With reference to your question that, if we carried it two years, we would charge 8 per cent. every month, my answer is, under the agreement we would have had to charge it if we carried it five years. That would be without reference to whether any inspection was made or not.

"With reference to how I can say this additional 8 per cent. was based on inspection charges alone, it is for the reason that we did not contemplate when we began this transaction that we were going to let him have any loans indefinitely. We put him on notice in every case of renewal, but he continued to do it. With reference to him continuing to pay the 8 per cent. additional, notwithstanding no inspections were made, we were abiding by the agreement made in his office.

"With reference to whether that is what we are standing on, the agreement of 16 per cent., my answer is, 'Yes, we thoroughly understood that and carried it out.'"

Others of the bank's officers testified to the same effect, its president emphasizing the details that, both under the loan agreement itself and the practice in carrying it out, the only purpose of the bank's reserving this right to make the inspections was to see that the loans were well secured, and that the half of this 16 per cent. advance deduction was always made as for that charge, whether any inspection was ever made or not, and that none ever was made upon any renewal loan. He said:

"With reference to what was the purpose of making an inspection, if it was not for the purpose of securing or seeing that the loans were well secured, that was the purpose."

"With reference to your question, 'We did not agree and start out to simply charge Johnson a reasonable fee for each inspection we made, that was not our plan,' my answer is, 'No, sir.' I agree we were charging him 16 per cent., but we were collecting 8 per cent. interest and 8 per cent. for inspection charges. It is my understanding that we were entitled to 8 per cent. inspection charges as long as that note run, regardless of whether any inspections were made or not. That was our plan of operation during the whole time he was doing business there."

"We were charging him 8 per cent. interest for the money—for the use of the money. The other 8 per cent. was for inspection charges that he had to pay whether there was an inspection or not."

"With reference to your question, 'Suppose he did not make further inspection, would we charge for inspection whether he made it or not,' my answer is, 'Yes, sir.' With reference to whether we went ahead and charged up 8 per cent. in addition to the 8 per cent. interest on all of the money used by him whether an inspection was made or not, my answer is, 'Yes, sir.'"

These loans extended over the period from October, 1923, to July, 1925, were evidenced by a total of 223 notes, of which 121 were renewals, and one inspection each was made on all original loans—142 houses being inspected on 108 trips for that purpose,—but no inspection was made on any renewal loan.

Mr. Schwartz, another of the bank's vice presidents, made all these inspections for it, except possibly four or five, but was paid nothing additional to what his compensation otherwise was from the bank for that service to it. Mr. Johnson furnished him transportation to and from the properties on all these trips.

Quite a number of the 223 notes were renewed from four to fourteen times, with never but the one original inspection of the property, but with always the deduction of the 16 per cent. discount at each recurring maturity date.

There was always ample collateral put up on each loan, into which the additional worth of the land under the buildings did not enter at all, the value of it amounting in most, if not all, instances to twice the sum loaned on it.

[1] The controlling question the appeal presents is, Did the collection of the 16 per cent. on the loans in question amount to usu-

ry upon the bank's part, as defined in R. S. art. 5069, that is, to interest in excess of the 10 per cent. per annum allowed by law?

[2] We are constrained to hold that it did. While in the technique and nomenclature of banking it may be more exact to term this deduction so made "discount," as the appellee's officials did, it is interest, and nothing more, within the meaning of the statute, if it was merely "compensation for the use, forbearance, or detention of money"; that it was that and only that seems demonstrable when you back off a little way and look with some perspective upon the completed transaction as an entirety. Concretely, that is indeed the only proper way it may be viewed for the purpose of determining whether it squares with our public policy, because, in frank and apparently conscientious defense of it, the appellee declared upon an enabling contract, entire in its nature, which, while not obligating the bank to make any inspections at all, yet unconditionally required appellant to pay in advance the full 16 per cent. per annum— ascertained purely as an interest calculation —for the stipulated period of its detention upon every dollar loaned him, whether any inspections were to be made or not; the mere dubbing of one-half the sum thus arrived at "inspection fees," even by mutual assent, would not make it so, especially where no inspection was in fact made, but rather would just amount to a circumlocution, and hence to a direct contravention of our statute, which says:

"All written contracts whatsoever, which may in any way, directly or indirectly, provide for a greater rate of interest [than ten per cent. per annum] shall be void and of no effect for the amount or value of the interest only." Rev. St. 1925, art. 5071.

[3] The transaction is to be tested by its substance, not its form, and, if from all the facts its essence is found to be the receiving or contracting for a greater rate of interest than is allowed by law, the statutory consequences must be visited upon it. 27 R. C. L. p. 211.

This consideration answers adversely the argument of appellee's able counsel that the bank did not intend the second 8 per cent. as compensation for the use and detention of the money, but for inspection services performed.

If anything further is needed to show that such was the effect of this agreement, or "plan, scheme, or arrangement," as the bank's officers themselves termed it, these attending circumstances are available: Although the bank's business was money lending, the inspection privilege so reserved was for its benefit exclusively, in order to enable it to pass upon the sufficiency of the security offered. In making all the inspections that were made, it was put to no expense otherwise, and its regular appraiser, Vice President Schwartz, who not only did that work anyway, but also passed on all its important loans, was paid nothing extra for rendering it that additional service in this instance. Admittedly it was never even contemplated that appellant was to, nor did it in fact ever, get anything except the use of the money. No quid pro quo could therefore have gone to it for anything else, and so it results practically that the use of the money was alike the only advantage to the one party to the "arrangement," and the only detriment to the other. The evidence seems to make negligible the inconsequential amount—if any at all— of extra trouble and expense in carrying these loans, and to indicate that it should be regarded as the incidental overhead to the conduct of the business.

The mere taking out in advance, by the discounting method, of the full conventional interest rate in Texas of 10 per cent. per annum on short-term loans like these, did not constitute usury, but that malum prohibitum lay in tacking on still another 6 per cent. per annum charge for no additional or different service to the borrower, but for "the amount of trouble to the bank in carrying that type of loan." Fowler v. Equitable Trust Co., 141 U. S. 384, 12 S. Ct. 1, 35 L. Ed. 786; Texas Loan Agency v. Hunter, 13 Tex. Civ. App. 402, 35 S. W. 402; Federal Mortgage Co. v. Bank (Tex. Civ. App.) 254 S. W. 1002.

Had the contract required the inspections, and the 8 per cent. on that account been only chargeable where they were actually made, as well as shown to be a reasonable compensation for the service, the majority of this court are unwilling to hold that, so far, it would have been usurious; but, as pointed out, that is not the case made for the appellee here.

[4, 5] Under these conclusions, since the only reasonable inference from the undisputed facts is that excessive interest was collected, the jury's contrary verdict becomes immaterial. Rantala v. Haish, 132 Minn. 323, 156 N. W. 666; Galveston & H. Inv. Co. v. Grymes (Tex. Civ. App.) 50 S. W. 470; In re Fishel, Nessler & Co. (D. C.) 192 F. p. 416, note; Wortman v. Young (Tex. Com. App.) 235 S. W. 559.

The authorities cited by the appellee as upholding a contrary doctrine are thought to be distinguishable, in that, in most, if not all, instances, they involved legitimate benefits *to the borrower*, either from third persons not sharing them with the lender or from the lender direct for some distinctly separate and additional consideration than the simple loaning of the money.

The contract being void, there remains nothing for this court to do in carrying out the mandate of the cited statutes but to declare it of no effect for the $3,778.63 interest paid, reverse the trial court's judgment, and here enter judgment in appellant's favor for twice that sum, or $7,557.26, together with 6

per cent. interest per annum thereon from May 1, 1926, until paid. That order has accordingly been entered.

Reversed and rendered.