GENERAL SOUTHWESTERN CORPORA-
TION et al., Appellants,

v.

STATE of Texas, Appellee.

No. 13433.

Court of Civil Appeals of Texas.

Houston.

Feb. 18, 1960.

Rehearing Denied March 17, 1960.

James P. Markham, Jr., H. Fletcher Brown, Houston, for appellant.

Will Wilson, Atty. Gen., W. V. Geppert, Larry Jones and Thomas Burrus, Asst. Attys. Gen., Joe Resweber, County Atty., Houston, for appellee.

WOODRUFF, Justice.

The State of Texas, through Will Wilson, its Attorney General, and Joe Resweber, County Attorney of Harris County, filed this suit under the provisions of Article 4646b, Vernon's Ann.Civ.St., seeking a temporary injunction to restrain appellants, General Southwestern Corporation, seven other corporations and eleven individuals from violating the usury laws of Texas pendente lite, and a permanent injunction on final trial. After a hearing, the Trial Court granted a temporary injunction, which appellants superseded pending appeal by filing bond.

The State contended that General Southwestern, through its officers, directors and stockholders, controlled and directed a combine composed of all the appellants in lending money to the public in small loans at usurious interest; that appellant, General Southwestern, in conjunction with Intercoastal Resources Corporation, furnished the money used by appellant corporations, Apex Credit Company, Thriftway Finance Co., Southwestern Subsidiary Corporation, and Cordial Finance Corporation, in operating six local loan offices, lending money to the public at usurious in-

terest, four of which offices were in Houston and two in Dallas. All were operated under assumed names except the one office conducted by Cordial Finance.

In eight Points appellants assert the Trial Court erred because: (1) Neither the common law nor Article 4646b, V.A.T.S., authorized the granting of a temporary injunction; (2) Alternatively, if there is authority therefor, the Trial Court exceeded the scope and purpose thereof, thus constituting an abuse of discretion; (3) That the order and Article 4646b, V.A.T.S., deny appellants' rights guaranteed under the Constitutions of Texas and the United States, by depriving them of their property without due process of law; and (4) There was neither a sufficient nor a prima facie showing that appellants were engaged in the business of loaning money at usurious interest.

Since the last Point requires a review of the proof which to a degree is essential to a discussion of the other Points, it will be considered first.

In reviewing the evidence before a trial court granting a temporary injunction, we are required to give effect to that which was undisputed and not subject to any qualification. As to the disputed evidence, we are required to consider only that, together with all reasonable inferences that may be drawn therefrom, which is most favorable to the appellee. Hotel & Restaurant, Employees' International Alliance & Bartenders' International League of America v. Longley, Tex.Civ.App., 160 S.W.2d 124, 126; Red Devil Club v. State of Texas, Tex.Civ.App., 307 S.W.2d 627. "In other words, on appeal the evidence must be construed as sustaining the action of the trial court in granting or refusing a temporary injunction unless such evidence was of the character to compel a contrary conclusion from that on which the trial court presumably acted." International Ass'n of Machinists Lodge 1488 v. Downtown Employees Ass'n, Tex.Civ.App., 204 S.W.2d 685, 686.

With reference to the State's contention that General Southwestern, by and through its officers and directors, appellants Horace O. Menking, Otis D. Jenkins, Benjamin Taylor, Jr., James P. Markham, Jr. and Jo W. Walker, Jr., controlled and directed these operations, it was stipulated that the petition stated the facts as to the parties, their stock ownership, their capacities as officers and directors and the interlocking stock-ownership between the companies,[1] except appellants did not admit that Otis

---

1. In this connection it was stipulated that Horace O. Menking was president of General Southwestern and Otis D. Jenkins was its executive vice president; that Jo W. Walker, Jr. was president of Thriftway Finance Company and Apex Credit Company; that 88% of the outstanding stock of Thriftway Finance Co. is owned by Apex Credit Co.; that James P. Markham, Jr., is vice president and a director of Apex Credit Co.; that Benjamin Taylor, Jr., Otis D. Jenkins, J. P. Markham, Jr., Horace O. Menking and Thriftway Finance Co. jointly own 38% of the outstanding stock of Apex Credit Co.; that James P. Markham, Jr. is vice president and one of three directors of Southwestern Subsidiary Corp.; that Otis D. Jenkins, James P. Markham, Jr., Horace O. Menking and Benjamin Taylor, Jr., jointly own 34% of its outstanding stock; that Apex Credit Co. owns 88% of the outstanding stock of Cordial Finance Co.

and James P. Markham, Jr. is its vice president and one of its four directors; that Apex Credit Co. owns 42.59% of the outstanding stock of Intercoastal Resources Corp. and that Apex's stock ownership combined with that of Benjamin Taylor, Jr., Otis D. Jenkins, James P. Markham, Jr., and Horace O. Menking, amounts to 65.97% of Intercoastal's outstanding stock, and Jo W. Walker, Jr. is its vice president, treasurer and one of its three directors. Benjamin Taylor, Jr. is also secretary and a director of General Southwestern and one of its three incorporators; and James P. Markham, Jr. is the attorney for all the defendants and one of the incorporators of each corporation. Also Otis D. Jenkins was one of the incorporators of Southwestern Subsidiary Corp. and owns substantial stock in Apex Credit Co. and Intercoastal Resources Corp.

D. Jenkins was "anything more" than executive vice president of General Southwestern. However, it was clearly shown by appellant Jo W. Walker, Jr., that Otis D. Jenkins, with the approval of General Southwestern's board of directors, maintained direct supervision over the loan offices, for which service he was paid $250 per month by these offices. He was authorized to draw checks on the loan offices and he collected $100 per month for advertising. The remaining individual appellants appear to have been loan office employees, who handled the making of loans.

The loan office procedure was shown by the testimony of appellant, Jo W. Walker, Jr., president of Thriftway Finance and manager of its loan office, Acme Credit, who was called as an adverse witness by the State. It was shown that each prospective borrower was asked to sign an agreement employing the loan office or the corporation that operated it under that trade-name to obtain and service the loan and to guarantee its payment, for which he agreed to pay a brokerage. While he waited, his credit was checked and passed on by an employee of the loan office. If approved, the borrower executed a note prepared by the employee payable to appellant Intercoastal Resources for a sum, in the amount the applicant wished to borrow, plus a brokerage charge, which in each instance, if considered as interest, rendered the loan usurious. Upon the borrower's signing the note, the employee delivered to him in cash the amount of the note, less the brokerage, from unsegregated funds in the cash drawer of the loan office which were accumulated from note payments on loans previously made by that office.

Each loan office made daily reports to Business Records Service, the trade-name of appellant Benjamin Taylor, Jr., who kept the books and records for all these loan offices and companies in an office located in the suite occupied by General Southwestern, of which he was secretary and a director. On these reports, referred to as loan letters, were listed all notes made that day, giving each maker's name, the payments, amount advanced, the brokerage charged and amount of the note. Also, a list of all payments on notes held by the loan office made that day, showing the amount unpaid, the payment and balance due, was forwarded with the loan letters. No cash or checks accompanied these reports. Mr. Taylor's testimony showed that they were used for the making of entries upon the books of the loan offices, the corporations that operated them, Intercoastal Resources and General Southwestern, purporting to effect an assignment of the notes by the loan offices to Intercoastal, which in turn discounted them to General Southwestern, although the notes were retained by the loan offices for service and collection. His testimony further showed that from the data set out on the daily reports, apportionments of the brokerage charges were made on the records between these corporations and the loan offices, and we think it evident that the collection of these items by General Southwestern and Intercoastal Resources was effected by Mr. Jenkins' authority to draw checks on the local loan offices. It was shown, too, that each of the loan offices made about 200 loans each month.

Proof was offered that on three typical loans made by Acme Credit Company within six months of suit, whereby the borrowers received $20, $50 and $100, the brokerage charges computed as interest would have been 340.46%, 207.30% and 269.39% annually after allowing as lawful expenses $1 for each $50 or fraction thereof loaned.

The Trial Court's findings recited in the order [2] "that there is probable injury and a probable threat to the laws of the State of Texas in that the pattern of operation

2. No findings of fact or conclusions of law other than those recited in the order were requested or filed.

of such defendants appears probably to result in the conduct of a business of habitually loaning money for the use and detention of which usurious interest has been charged against or contracted to be paid by citizens of this State contrary to the laws of this State, and that there exists a present and urgent necessity for the entry of an order enjoining and restraining such above named defendants", etc.

It is true that the law permits a broker who acts for a borrower in obtaining a loan from a third party to charge a fee for procuring the loan and it will not be taken into consideration in determining whether the loan is usurious, provided it is done in good faith and not as a ruse to cover usury. Great Southern Life Ins. Co. v. Williams, Tex.Civ.App., 135 S.W.2d 241, writ dism. However, equally well settled is the rule that in usury cases, as in other cases involving fraud, subterfuge and evasion of the law, liberality will be indulged in allowing inquiry into the truth of the transaction since the best evidence thereof is in the possession of the accused and is not readily available to the complaining party. State v. Abbott Loan Service, Tex.Civ.App., 195 S.W.2d 416. Likewise, it has been said that a transaction which is attacked as usurious is to be tested by its substance, not its form and if, from all the facts, its essence is found to be the receiving or contracting for a greater rate of interest than is allowed by law, the statutory consequences must be visited upon it. Independent Lumber Co. v. Gulf State Bank, Tex.Civ.App., 299 S.W. 939, writ ref.; Standard Supply & Hardware Co. v. Christian-Carpenter Drilling Co., Tex.Civ.App., 183 S.W.2d 657, writ ref.

This being a hearing on an application for temporary injunction, the question before the Court was the right of the State, as the applicant, to a preservation of the status quo of the subject matter of the suit pending a final trial on its merits. To warrant the issuance of such writ, the applicant, under proper pleadings, needs only to present by the evidence a case of probable right and probable injury. Since the Trial Court is clothed with broad discretion in determining whether to issue the writ, its order will be reversed only on a showing of a clear abuse of discretion. Transport Co. of Texas v. Robertson Transports, Inc., 152 Tex. 551, 261 S.W.2d 549; Southwestern Greyhound Lines, Inc. v. Railroad Commission, 128 Tex. 560, 99 S.W.2d 263, 109 A.L.R. 1235; International Ass'n of Machinists Lodge 1488 v. Downtown Employees Ass'n, Tex.Civ. App., 204 S.W.2d 685.

Tested by the rules announced in these authorities, the Trial Court's findings above set out in our opinion meet the requirements of the law warranting the issuance of a temporary injunction. Likewise, these findings, in our opinion, are amply supported by the proof above set out concerning the closely integrated operations of all the appellants, which convincingly shows that General Southwestern Corporation, acting through the five individual appellants, Horace A. Menking, Otis D. Jenkins, Benjamin Taylor, Jr., James A. Markham, Jr., and Jo W. Walker, Jr., controlled, directed and supervised the operations of all these appellants as an integrated organization which had for its purpose and, in fact, was performing the sole function of making small loans to the public. Thus, all charges made were in fact for the use, detention or forbearance of money, i. e., interest. The apportionment of the brokerage charges among themselves was of internal significance only in dividing the profits within their own organization and can have no controlling effect in determining the true nature of the enterprise. Appellants' contention attacking the sufficiency of the evidence is, therefore, overruled.

Appellants urge that the Trial Court had no authority under Article 4646b, V.A.T.S., or the common law, to grant a temporary injunction. Alternatively, they contend

that if there was any authority, the Trial Court's order exceeded its proper scope, and constituted an abuse of judicial discretion in that it was not directed to maintaining the status quo but to the ultimate relief, and thus deprives them of their rights of due process under the Federal and State Constitutions.

After having set forth the findings, as heretofore stated, the Trial Court's order directed the issuance of "a temporary injunction pending final hearing" against all the corporate and individual appellants, in terms hereafter stated.

First, appellants contend that Article 4646b, V.A.T.S., does not provide for and cannot be construed to authorize the granting of a temporary injunction. In this connection they attack the opinions in Texas Finance & Thrift Ass'n v. State, Tex.Civ.App. Dallas, 224 S.W.2d 522, and Gifford v. State, Tex.Civ.App. El Paso, 229 S.W.2d 949, and say that the issues here raised by appellants were not discussed in those cases; that the holdings relating to the preservation of the status quo are irreconcilable; that the latter case did not cite the former; and that no writ action was taken in either case. Under these circumstances, they urge that they should be accorded the privilege of approaching the issue "afresh" without being bound by those cases.

At this point, it should be noted that the constitutionality of Article 4646b was upheld against manifold attacks in Watts v. Mann, Tex.Civ.App., 187 S.W.2d 917, and the Supreme Court's refusal to grant a writ of error evidenced its conviction that the principles of law declared therein were correctly determined. Rule 483, Texas Rules of Civil Procedure; Heinatz v. Allen, 147 Tex. 512, 217 S.W.2d 994.—In an exhaustive analysis, the statute was declared constitutional and sufficient in its terms to grant effective injunctive relief.— It did, however, involve the granting of a permanent injunction under Article 4646b and in response to one of the many attacks on its constitutionality and the sufficiency of its provisions to warrant such relief because the Act did not expressly declare the business of the habitual usurers as a nuisance, the Court said [187 S.W.2d 927]:

> "The Act specifically denounces the business it defines as habitual practice of money lending usury, expressly declares the public interest in the subject, and provides a specific preventive, injunction against its further practice. It is not essential that the Act should have expressly denominated the practice as a nuisance."

Immediately following this statement, the Court proceeded to reconcile it with Ex parte Hughes, 133 Tex. 505, 129 S.W.2d 270, and concluded as follows:

> "That decision was handed down in June, 1939. The Loan Act was passed at the next regular session of the legislature (1943), containing the above-quoted reference to the Hughes decision in its emergency clause. We think there can be no serious question but that it was a valid exercise of legislative power."

In pressing their contention that Article 4646b cannot be construed to contemplate the granting of a temporary injunction, appellants have cited many cases. Thus reference is made to City of Fort Worth v. Tarlton, Tex.Civ.App., 151 S.W.2d 268, and Fort Worth Acid Works v. City of Ft. Worth, Tex.Civ.App., 248 S.W. 822, affirmed Tex.Com.App., 259 S.W. 919, which obviously involve the definiteness required of pleadings in suits for injunction and have no relevancy to rules governing the construction of statutes. Also, we are unable to agree with appellants' argument that Article 4668, passed in 1919, pertaining to the operation of pool halls, and that the 1943 amendment to the Liquor Control Act (Article 666–29, Vernon's Ann.P.C.), prohibiting the unlawful sale, etc., of intoxicating beverages, each of which provide for the granting of temporary and permanent injunctions, demonstrate the Legis-

lature's consciousness of the several injunctive proceedings which precludes a construction of Article 4646b that contemplates any injunction except a permanent injunction. Nor can we subscribe to appellants' position that because Article 4646b, V.A.T.S., and Article 666–29, P.C., were passed at the same session of the Legislature, they are in pari materia and must be construed together. Garrett v. Mercantile National Bank at Dallas, 140 Tex. 394, 168 S.W.2d 636, 637, upon which they rely, clearly shows that the two statutes to which the rule was applied were not only passed at the same session, but both dealt with the subject of procedure in perfecting appeals and necessarily "in ascertaining the legislative intent" they had to be read together "in the light of the other, as though they were embraced in one Act or were supplemental to each other."

■ Article 666–29, P.C., and Article 4646b, V.A.T.S., cannot be read together. One involves violations of the Liquor Control Act and the other the activities of habitual usurers. They are not in pari materia.

Appellants have cited other cases construing other statutes, none of which involves injunctions. Basically, they follow the general rule as it is ordinarily stated that in construing statutes, the purpose is to ascertain the legislative intent, and in that effort the context of the statute is to be considered and the intent finally ascertained must be consistent with and fairly expressed by the words of the enactment. Though it is not pertinent here, this rule in some instances is subject to qualification. See Gilmore v. Waples, 108 Tex. 167, 188 S.W. 1037; Texas & N. O. R. Co. v. Railroad Commission of Texas, 145 Tex. 541, 200 S.W.2d 626.

■ After carefully considering the cases cited by appellants and many others, we are convinced that Article 4646b was properly construed in Texas Finance & Thrift Ass'n v. State, supra, to authorize the granting of a temporary injunction,

and we think the reasoning in that opinion clearly supports that conclusion. Without any intention to improve the logic there employed, in passing it might also be observed that the word "enjoin" connotes a degree of urgency for immediate action. See 1 Bouv. Law Dict. Rawle's Third Revision, p. 1041; 30 C.J.S., p. 254. When the term "to enjoin" is followed as it is in Sec. 2a by the phrase "in the trial of *any application* for injunction" it clearly demonstrates the legislature's intent to provide for a temporary injunction.

Appellants argue, with the suggestion that "the Legislature no doubt had it in mind" when Art. 4646b was enacted, that a temporary injunction is not such equitable relief as can be granted against the operator of small loan offices because the status quo cannot be preserved, their theory being that the necessary effect of any interference with their business of making small loans or collecting on loans previously made during the pendency of suit for final hearing would destroy their business. The pith of this novel approach is set forth in their brief, as follows:

> "The amounts loaned, brokerage payment, guaranty, and service fee obligations are normally too small to be economically recovered by suit and the debtors are persons who enjoy large immunity from execution or garnishment under our exemption laws. It is a business dependent on steady and uninterrupted attention to collection. A temporary injunction would inevitably have a grave effect on the voluntary honoring of existing obligations. The stopping of future loan or brokerage and service operations would also make existing loans uncollectable. The loan and service obligations are as perishable as a carload of fish on a siding without ice."

Appellants seek support from the opinion in Houston Belt & Terminal Ry. Co. v. Texas & N. O. R. Co., 155 Tex. 407, 289 S.W.2d 217, 219, which holds that on a

temporary injunction hearing the only question before the court is the right of the applicant to the preservation of the status quo pending final trial and the court is not authorized to enter "a judgment on the merits", in legal parlance a permanent injunction, and thus deprive "the losing party" of sufficient time for preparation and "the right to elect to have a jury trial on any contested issues of fact."

Appellants continue by saying though it be not contended that a temporary injunction hearing should have the legal decisiveness "of a trial on the merits", if its effect, "as it will be in a small loan business, of destroying the existing business and the collectability of the existing obligations, the theoretical right to a subsequent jury trial to see whether they were rightly or wrongly destroyed will be a mockery."

The essence of their argument is that they can't operate without financial loss within the bounds of the law, and though the trial court on this preliminary hearing has in effect found them to be law violators within the purview of Art. 4646b, constituting a nuisance, they should be immune from a temporary injunction. Certainly it does not comport with reason to say that the equitable relief provided by law is to be thwarted because a business cannot be profitably operated within the purview of the law. This would, indeed, put law violators in a privileged class and ignores the principle that he who seeks equity must do equity.

However, appellants further insist that despite the proof offered by the State which, as heretofore shown, clearly established they were conducting their business as an integrated combine and which they were content to leave unchallenged on the hearing for temporary injunction, that the status quo was their method of operating at the time suit was filed which could not be altered by an order on a temporary injunction hearing. For support they cite Railroad Commission v. Shell Oil Co., 146 Tex. 286, 206 S.W.2d 235; Transport Co. of Texas v. Robertson Transports, Inc., 152 Tex. 551, 261 S.W.2d 549; Southwestern Associated Tel. Co. v. City of Dalhart, Tex.Civ.App., 254 S.W.2d 819, n. r. e. The distinction between those cases and the status quo upon which appellants would stand, is that status quo there relied upon had been legally fixed and the objectives of the temporary injunction suits were to change them. Read in their proper perspective, those cases support the State's contention that the status quo is fixed by Art. XVI, Sec. 11, of the Constitution of Texas, Vernon's Ann.St., providing that "All contracts for a greater rate of interest than ten percentum per annum, shall be deemed usurious * * *."; that Art. 5069, V.A.T.S., providing that "'Interest' is the compensation allowed by law or fixed by the parties * * * for the use or forbearance or detention of money, * * * not to exceed ten per cent per annum"; that "'Usury' is interest in excess of the amount allowed by law; all contracts for usury are contrary to public policy"; and the prohibitions contained in Art. 5071, V.A.T.S., against parties in written contracts agreeing to or stipulating for any greater rate of interest than ten per cent per annum and declaring "all written contracts whatsoever, which may in any way, directly or indirectly, provide for a greater rate of interest shall be void and of no effect for the amount or value of the interest only." The "status quo" was a rate of interest (used here for brevity in its broadest sense) that did not exceed ten per cent per annum

When, therefore, the injunctive processes contemplated by Rules 680 to 693–a, T.R.C.P., with special reference to Rule 681, relating to temporary injunctions that concern us here, are invoked by the provisions of Art. 4646b, V.A.T.S., we find ample law to support the State's action and the relief that was granted by the Trial Court in the issuance of a temporary injunction.

The order of the Trial Court in this case directing the issuance of a "temporary injunction pending final hearing" provided:

"You and each of you are hereby enjoined and restrained from demanding, receiving or by the use of any means attempting to collect from the borrower usurious interest *on account of,* and from hereafter charging any borrower usurious interest *on account of,* and from hereafter contracting for any usurious interest *upon,* any loan made after the date of this order *on the arrangements, methods of operation or structural organization used by said respective defendants* during the period of six months next preceding the filing of this suit or during the period intervening between the filing hereof and the hearing hereof, *or upon any like arrangements, methods of operation, or structural organization,* that is, in addition to the sums paid to or for the benefit of the borrower, from charging or collecting upon or in connection with any loan hereafter made *upon said aforestated structural organization, arrangements and methods,* any greater sum than ten (10%) per cent per annum (either *as interest or a combination of interest and fees for acting or serving as broker, agent, guarantor, endorser, collector or other servicer of loan accounts;*) \* \*" (Italics ours)

As previously noted, appellants have assailed the holdings in Texas Finance & Thrift Ass'n, and Gifford v. State, supra, as being irreconcilable. This argument in our opinion is untenable. In Texas Finance & Thrift Ass'n the issue of usury was raised by the loan company's requiring its borrowers to pay, in addition to legal interest, premiums for life and disability insurance policies retained by the company which, if added to the interest recited, rendered the loans usurious. The trial court on a temporary injunction hearing entered an order requiring defendant to cease its insurance coverage. This, as the Court of Civil Appeals noted, was the sole objective sought by final injunction. After pointing out that the purpose of a temporary injunc-

tion order is to maintain the status quo in regard to the matter in controversy, the court said [224 S.W.2d 224]:

"However, this is not to say that no order was authorized, pendente lite, in maintenance of the status quo. Under all testimony the court was well warranted in issuance of restraint in terms of the statute until final trial on its petition for injunction. An order so worded would not prematurely deprive the finance company of any right recognized by law; \* \* \*."

In concluding its opinion, the court modified the trial court's order to restrain the defendant from "demanding, receiving, or by the use of any means attempting to collect from the borrower usurious interest on account of any loan, or from thereafter charging any borrower usurious interest, or contracting for any usurious interest" pending final trial.

In Gifford v. State, supra, the defendant engaged in the business of loaning money to purchasers of automobiles on the basis of a price in excess of that (known by defendant) paid to the dealer. The difference, patently a charge for the use and detention of money, when added to the interest recited in the notes, rendered the loans usurious. The State sued Gifford under Art. 4646b, seeking temporary and permanent injunction. The only reference to the terms of the temporary order from which Gifford appealed is reflected by the opinion, as follows: "At the conclusion of a hearing the trial court granted a temporary injunction from which order this appeal is prosecuted on a supersedeas bond." We think it axiomatic that in the absence of a showing to the contrary it must be presumed that the Trial Court entered an appropriate order to preserve the status quo, though we cannot say that the order was the same as that in Texas Finance & Thrift Ass'n v. State, supra.

Though the Texas Finance & Thrift Ass'n case was not cited in the Gifford case, we think that the opinions are in accord and

the same basic reasoning was applied in each case in their declarations of the status quo, as applicable to the issues before them.

■ The only logical conclusions to be drawn from all of the cases decided since Art. 4646b was enacted, in our opinion, are as follows: Art. 4646b authorizes the State to bring suits for temporary and permanent injunctions against habitual usurers, as classified and defined in the Act. When the State, in a hearing for temporary injunction, presents evidence under appropriate pleadings that usury, as defined by the Act, has been charged, contracted for, or collected, etc., by the defendant on three or more loans within six months before suit, a probable right and a probable injury has been established. The probable right is established by proof that shows that the defendant's activities fall within the provisions of Art. 4646b. The probable injury is established by proof that the law has been violated by defendant's engaging in a business within the category of a nuisance. See Watts v. Mann, supra. Upon proof of a probable right and a probable injury, it is the court's prerogative to grant a temporary injunction to maintain the status quo until the final trial. Transport Co. of Texas v. Robertson Transports, Inc., supra. We think that the following quotation from Gifford v. State, supra, will demonstrate the same reasoning as was used in Texas Finance & Thrift Ass'n v. State, supra, and the unanimity of these decisions will not only be demonstrated but nothing will be left to be inferred. They are as follows:

"As has already been suggested the court is only authorized to enjoin the acts complained of when it is determined the law is being violated, but when the violation is established it is the [court's] province and duty to restrain it. The status quo is that created by the law which fixes the maximum interest rate and prohibits usury. When usury is practiced the status quo created by the law is destroyed and under the law it becomes the duty of the court to re-establish the status quo and maintain it by prohibiting the violation by the exaction of an unlawful charge. Usury is unlawful and the article here under consideration provides a remedy by injunction to prevent its collection and a temporary injunction is an appropriate remedy. Lambert v. City of Port Arthur, Tex. Civ.App., 22 S.W.2d 320 (e. r.)."

■ Appellants complain of the provisions of the Trial Court's order, contending that it is broader in its provisions than necessary to preserve the status quo, thus constituting an abuse of judicial discretion. Though a temporary injunction order must be directed to the preservation of the status quo pending a trial on the merits, we think that it must be framed in language that will with a degree of certainty set forth the activities restrained.

In this case we have, as the proof showed and as reflected by the Trial Court's order, an involved and complex operation by and between a large number of people and corporations, acting in concert under an intricate and common plan whereby usurious loans were actually made and collected by the combine at the level of the local loan offices, but the usurious charges made, contracted for and collected thereon were divided between the appellants behind the scenes where the loans were made. In order to be effective the temporary order had to contemplate this method of operation and structural organization .in order to encompass all the appellants and the several roles in which the various appellants acted in accomplishing the end result.

We have attempted to demonstrate by placing emphasis on certain phrases and clauses in the temporary order, as hereinbefore shown, that the Trial Court's order in essence has only restrained appellants from demanding, etc., receiving or attempting to collect usurious interest on loans existing at the time of trial made under the methods of operation or structural organi-

zation or like arrangements, etc., during the six months preceding suit, and from thereafter, until final hearing, contracting for or collecting upon any loan made upon said structural organization, arrangements and methods of operation, any greater sum than ten per cent per annum "either *as interest* or *a combination of interest and fees for acting as broker, agent, guarantor, endorser, collector or other servicer of loan accounts.*" Obviously the last clause does no more than spell out in detail that which constitutes interest as a matter of law when a sole lender is involved because in such instances an order restraining contracting for, receiving or collecting usurious interest is sufficient. However, in this case where numerous parties were acting in concert behind the scenes where the loans were made and collected, each doing its or his part under "their methods of operation or structural organization," it is essential, as we view it, that the order be sufficiently specific to cover the role in which each party acted in the combine in order to provide effective restraint.

This view, in our opinion, is not in conflict with the holding in Texas Finance & Thrift Ass'n v. State. There the suit was brought against the finance company alone. The selling of insurance in connection with each loan raised the issue of usury. As the opinion shows, the court took the view that under the first paragraph of Sec. 2a, Art. 4646b, the requirement for insurance as an additional security to the lender, provided the plan is not a cover for usury, could be a legitimate charge. The trial court's temporary order, however, restrained the defendant from requiring its borrowers to take insurance, a possibly legitimate transaction if the facts so warranted it, though the trial court on the temporary hearing held to the contrary. The order, as modified by the Court of Civil Appeals, provided for effective temporary relief if the insurance was being charged as a screen for usury without curtailing appellant in the selling of insurance within the purview and spirit of the law.

We think, too, as the State contends, by the proof in this case it was shown that the arrangements, methods of operation and structural organization under which appellants operated, were all charges made on the loans and constituted interest, as a matter of law; whereas the proof in Texas Finance & Thrift Co. v. State, supra, showing appellant's requirement that its borrowers buy insurance only raised the issue of usury, thus necessitating the modification of the order so as not to prohibit any lawful sale of insurance by appellant. In both cases the temporary orders were directed to the preservation of the status quo. The only difference is to be found in terms fixing the status quo in conformity with the proof. In our opinion, the theory of maintaining the status quo is the same.

■ We, therefore, overrule appellants' contentions that the Trial Court's order exceeded its proper scope, and that the Trial Court abused its discretion.

■ Appellants have attacked Art. 4646b as being unconstitutional. Their primary contention on this Point is that if they are subjected to contempt proceedings for violating an order entered under the provisions of Art. 4646b, they will be subject to punishment by a court without specific penalties and be deprived of a right to trial by jury in violation of the due process provisions in the Constitution of Texas and the Fourteenth Amendment to the Constitution of the United States. These contentions have been considered in the holding in Watts v. Mann, supra. The power of a court to punish for a violation of its injunctions is so well established that it warrants no discussion. Such violations are in contempt of the court's orders and the power to punish is inherent. See Tex.Jur., Vol. 9, p. 605, et seq.

The judgment of the Trial Court is affirmed.