**CONSUMERS DISCOUNT CORPORATION et al.**

v.

**STATE of Texas.**

No. 7137.

Court of Civil Appeals of Texas.

Amarillo.

Dec. 4, 1961.

Rehearing Denied Jan. 8, 1962.

---

Weinberg & Sandoloski and W. R. Sessions, Dallas, for appellants.

Will Wilson, Atty. Gen., Elmer McVey, Asst. Atty. Gen., and Byron Fullerton, Austin, for appellee.

CHAPMAN, Justice.

This suit was filed in the trial court by the State of Texas through its Attorney General, Will Wilson, to enjoin violations and evasions of Art. 4646b Vernon's Tex. Civ.St., commonly known as the Loan Shark Act. Several of the defendants were dismissed during the trial for reasons immaterial to the issues here involved. In a trial to the jury against the four loan companies left after dismissals the jury found they were operating under a plan that constituted in substance a scheme to avoid the usury laws by concealing under cover of legal formalities the business of habitually loaning money for the use and detention of which usurious interest was charged against or contracted to be paid by the borrower. From such verdict the court rendered judgment permanently enjoining and restraining the defendant from:

"(1) Demanding, receiving, or by the use of any means attempting to collect

from any borrower usurious interest on account of any loan;

"(2) Hereafter charging any borrower usurious interest or contracting for any usurious interest;

"(3) Hereafter using the same plan of business as that used during the six month period next preceding the filing of this suit, which plan of business has been found to be in substance a scheme, device, or subterfuge to engage in the business of habitually loaning money at usurious interest.

"(4) Entering into any other plan, arrangement, subterfuge, or scheme, alone or in association with others, which will return to you and those with whom you may be associated compensation for the use, forebarance, or detention of money in excess of a legal rate per annum on the money actually delivered to, advanced, or extended to the borrower."

Only Consumers Discount Corporation and Nell Bond, individually and d/b/a Reliable Service Company have perfected their appeals. Such appeals were made to the Court of Civil Appeals in Dallas and transferred by the Supreme Court to us for our determination. The former will hereinafter be referred to as Consumers and the latter as Reliable, except when they are referred to jointly as Appellants. Atlantic Investment Corporation will hereinafter be referred to as Atlantic, American Finance Company as American, and Apex Finance Company as Apex. The State of Texas will be referred to as such or as appellee.

Five points of error are asserted by Consumers, the first of which is that the evidence is insufficient to support the verdict and judgment. In paragraph two of Reliable's appeal they urge the same point. Since the two institutions are tied so closely together in their operations we shall consider the points together.

As part of their contentions on the insufficiency of the evidence appellants assert that appellee should have been limited in its proof to transactions within the 6 months preceding the filing of the third amended petition because such petition alleged usurious loans within a period of 6 months preceding the filing of "this petition." The suit had originally been filed on December 10, 1958 and the pleading on which appellee went to trial was filed on September 21, 1960. Proof of the usurious transactions relied upon for injunction were made generally during the period of 6 months preceding December 10, 1958 and the issues were submitted to the jury on loan transactions during that period. No authorities are cited by either appellant to support their contentions. In fact, we have the very unusual situation in this case of a 20 page brief by Consumers without the citation of one single authority and an 8 page brief by Reliable with only one authority, and it not in point on any issue in the case.

Section 2 of Art. 4646b provides in part:

"By the term 'habitually' as used in this Act, is meant the making of as many as three (3) loans on which or in connection with which usurious interest is charged or contracted for within a period of six (6) months next preceding the filing of any such suit.

"By the term 'usurious interest' as used in this Act, is meant interest at a rate in excess of ten (10%) per centum per annum. * * *

"In the trial of any application for injunction under this Act there shall exist a prima facie presumption that the actual and necessary expenses of making any such loan was One ($1.00) Dollar for each Fifty ($50.00) Dollars, or fractional part thereof loaned; but this prima facie presumption shall extend only to the first note or debt owing at the same time by an individual to any person, firm, corporation, partnership or association, and shall not apply to any renewal or extention thereof unless the original note or debt and all

extentions thereof were for a period of not less than sixty (60) days."

The designation of a minimum of three offenses for any six months period was merely to have a definite criterion by which to distinguish the habitual from the mere casual usurer.[1] It is obvious that the use of the term "this petition" in the amended pleading, concerning the 6 months in which the three usurious transactions were alleged, had reference to the filing of the suit rather than the filing of "this petition." Additionally, there is not anything whatever in the record to show that appellants' could have been harmed by such proof and pleading. Their spurious defense was the same regardless of the dates of the loan transactions and their objections were that the period in which the proof was permitted was too remote. We believe the trial court correctly refused to consider this highly technical contention involving a case of fraud, subterfuge and evasion.

"It is a well established rule in this state that, in usury cases as in other cases involving fraud, subterfuge and evasion of the law, that the law is liberal in allowing inquiry into the real truth of the transaction involved since the best evidence of the transaction is in the exclusive possession of the accused and not readily available to the complaining party." State v. Abbott Loan Service et al. Tex.Civ.App., 195 S.W. 2d 416.

As part of this point of insufficiency of the evidence Consumers also contends the State of Texas did not establish that there was any agreement existing between Consumers and any other defendant such as to show participation by it in usurious transactions within the six months period preceding December 10, 1958. In its support of the allegations of conspiracy, subterfuge, scheme and joint adventure appellee introduced over three hundred pages of testimony and myriad exhibits showing the connections of Consumers, the purported lender with the purported brokers.[2] Even though some of the purported brokers were dismissed during the trial the court properly admitted evidence between them and Consumers, since the type operations between them and Consumers was essentially the same as between Consumers and the "brokers" left in the case.

For example, Willard Dwain Montgomery, an employee of Atlantic, testified in effect that Mr. Luther of Consumers had the final word in approving all new loans by Atlantic after certain credit information on the applicant was furnished him by Atlantic; that in order to do business or establish a line of credit with Consumers, Atlantic had to establish a guarantor's reserve with Consumers which was to secure 80% of all loans made by Atlantic; that Consumers had such control of the reserve account that in all probability Consumers would not have honored a draft had the guarantor's reserve dropped below twenty per cent of Atlantic's outstanding loan balance; that Consumers' Mr. Luther outlined in detail to Atlantic just how the brokerage operation was to be set up, how it would work, and even furnished specimen copies of the forms necessary to carry out the scheme; that the two companies entered into a contract under which Consumers became the "lender" and Atlantic the "broker" and that more than three loans were made during the period inquired about for which charges were made in accordance with a standard rate card.

Mrs. Barbara Teat Landon testified to relations between Consumers and American during the six months period inquired about. Her testimony shows essentially the same type dealings between and requirements by Consumers and American as Consumers had

---

1. Watts et al. v. Mann et al., Tex.Civ.App., 187 S.W.2d 917, 925 (writ refused.)

2. Under the "brokerage" system a fee was charged every borrower as a purported brokerage fee by which the "broker" acted as agent for the borrower to Consumers, the "lender."

with the other companies. She also testified that American charged according to the length of time for which the loan was made, the longer the loan the higher the "brokerage" fee. The rates she testified about were practically the same as those of the other companies, and when examined by an accountant showed to range from .203.5 per cent to 317.8 per cent.

The testimony of Mrs. Bernice L. Weaver, an employee of Apex, showed almost an identical type operation between her company and Consumers and substantially the same preliminary steps in making the loan.

The testimony of Jimmie Lontos, an employee of Reliable, and a very reluctant witness, showed the procedure followed by his company in the processing of a loan was practically identical with that of Atlantic and that he handled more than fifty loans in the period inquired about. The fees charged were in accordance with the company's rate chart and ranged in about the percentage above shown. Lontos also testified Reliable gave them the money and that the "brokerage" fee varied with the length of the loan, the fee graduating upwards in proportion to the length of the loan. There seems to us to be some significance in the first few answers made by Lontos when he was first questioned as follows:

"Q. Now what is your occupation or profession, Mr. Lontos.

"A. I'm in the loan business—finance business.

\* \* \* \* \* \*

"Q. You're in the finance business?

"A. Yes.

"Q. And do you use the terms 'loan business' and 'finance business' synonymously, Mr. Lontos?

"A. Well, they're about the same."

It is true he then answered that they arranged the loans, after counsel for the State of Texas pursued the question, but we think the court in submitting the questions to the jury and the jury in answering them had a right to take into consideration Lontos' first response to the effect that Reliable was in the "loan business—finance business," and that the terms are used about the same. Especially is this true when taken into consideration with all the other testimony indicating conspiracy and scheme in the operations between Consumers and the so called brokers, all of which was to evade the usury laws.

When this record is studied carefully, as we have studied it, it is clear that the operations between Consumers and all the so-called brokers conform almost identically in their material dealings with each other and with the borrowers as is revealed in the records approved by a number of our Courts of Civil Appeals as constituting violations of the statute with which we are here dealing.[3] A detailed discussion of these lengthy decisions would be supererogatory but we think it would not be amiss to quote some rules of law announced in earlier cases concerning usury by which the courts have apparently been guided in passing upon whether the devious contrivances employed by money lenders constituted attempted evasions of the usury laws. In the early days of our republic Chief Justice Marshall, speaking for the Supreme Court of the United States in Scott v. John Lloyd, 9 Peters 418, 34 U.S. 418, 9 L.Ed. 178 said:

"The ingenuity of lenders has devised many contrivances by which, under forms sanctioned by law, the statute may be evaded. \* \* \* Yet it is apparent that, if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute will become a dead letter. Courts, therefore, perceived the neces-

---

3. Wilson Finance Co. et al. v. State of Texas, Tex.Civ.App., 342 S.W.2d 117; General Southwestern Corporation et al. v. State of Texas, Tex.Civ.App., 333 S.W. 2d 164.

sity of disregarding the form and examining into the real nature of the transaction."

In passing upon the very statute here involved the Court of Civil Appeals of Galveston [4] in quoting with approval from another court has said:

"* * * where 'there is doubt as to whether the transaction is a cover for usury, or a perfectly fair one authorized by law, then it is a question for the jury to determine, from all the facts and circumstances of the case, whether the transaction disclosed is bona fide in the ordinary course of business, free from the taint of usury, or whether it was a mere cloak and devise, under the form of an ordinary business transaction, to obtain more than legal interest.' "

In a plan very similar to the one here under consideration the Supreme Court of Kansas [5] has said:

"It seems somewhat remarkable and challenging that if the corporation was actually brokering the loans, it would maintain with the lender an amount of security that would guarantee the lender against loss to the extent of 80 to 85 per cent, in addition to the notes which certainly had a substantial value.

\* \* \* \* \* \*

"We have no difficulty in concluding that the forms used and the methods followed by the corporation in the conduct of its business were subterfuges to give an apparently lawful appearance to what in fact were usurious contracts and that the trial court erred in its conclusions of law to the contrary."

▪ From these authorities and the facts developed in the case it is apparent to us that the trial court properly presented the questions to the jury as to whether Consumers and the so-called brokers were op-

erating under a plan that constituted in substance a scheme to evade the usury laws.

▪ Appellants next assert that Special Issues 2, 3 and 4 were multifarious and that the court committed reversible error in submitting them in the form given. The issues inquired if the plan of operation of Consumers and Atlantic, Consumers and American, and Consumers and Reliable were in substance a scheme by which they were charging usurious interest and we think were in proper form. In Howell v. Howell, 147 Tex. 14, 210 S.W.2d 978, 980 our Supreme Court has said:

"Where, as in this case, the one ultimate issue embraces a number of subsidiary facts, it is not improper to include in the issue these several facts, and a special issue so framed is not duplicitous."

▪ Consumers next asserts reversible error in the failure of the court to define the terms "scheme" and "lender" as used in the charge. The points are without merit. Our Supreme Court has approved the following statement in Lee et al. v. Wilson et al., Tex.Civ.App., 91 S.W.2d 461 by refusing a writ outright in the case:

"* * * where necessary, the duty devolves upon the court to accompany the issues with such explanations and definitions as shall be necessary to enable the jury to perform its function of fact finding whether the defined word or explained term be strictly speaking a technical 'legal' term or such nonlegal word or term as that its use in the charge might confuse or mislead the jury in the absence of a definition or explanation thereof."

We recognize the statement just quoted as the law but the two words are used in this charge in their common and accepted meaning, are certainly such words as come with-

4. State v. Abbott Loan Service et al., 195 S.W.2d 416.

5. State ex rel. Fatzer v. Miller, 177 Kansas 324, 279 P.2d 223, 52 A.L.R.2d 691.

in the scope of the vocabulary of average laymen, and as such are susceptible of only one meaning. Therefore, it is not necessary to define them. Roosth & Genecov Production Co. v. White et al., Tex.Civ.App., 257 S.W.2d 140. Furthermore, the record does not reveal the tender by appellants of substantially correct definitions as required in Rule 279, Vernon's Ann. Texas Rules of Civil Procedure.

Finding no reversible error in the case the judgment of the trial court is in all things affirmed.